HAMLIN, Justice.
Defendant was charged by bill of information in the First Parish Court for the Parish of Jefferson as follows:
“ * * * on or about the THIRD (3rd) day of AUGUST in the year of our Lord One Thousand Nine Hundred and SIXTY-EIGHT (1968) with force *111 and arms, in the Parish aforesaid * * * did willfully and unlawfully commit the crime of Vagrancy' as defined in R.S. 14:107 in that he did loiter at Wabash and Harvard, without being able to account for his lawful presence thereat,
“Count 2) And the District Attorney further gives the Court to be informed and to understand that the said Donald Lopez did then and there willfully and unlawfully disturb the peace by using loud and boisterous language, in such a manner as would foreseeably disturb and alarm the public at Wabash and Harvard,
“Count 3) And the District Attorney further gives the Court to be informed and to understand that the said Donald Lopez did then and there intentionally oppose and resist officers of the law, one Deputy H. Toepfer, and Deputy Daniel Samrow * * * ”
On July 9, 1969, defendant was tried, found guilty, and sentenced on Count 1, “Vagrancy,” to pay a fine of $50.00 and costs or serve 25 days; on Count 2, “Disturbing the Peace,” to pay a fine of $25.00 and costs or serve 25 days; and on Count 3, “Resisting Arrest,” to pay a fine of $325.00 and serve 90 days in the Parish Prison, plus an additional 90 days if the fine was not paid.
Thelma Brockhoff, defendant’s companion at the time of his arrest, was simultaneously arrested with defendant and charged with “Vagrancy.” Her case was-consolidated for trial with that of the defendant. During the course of trial, the trial court sustained her motion for a directed verdict; she was thus acquitted of “Vagrancy.”
On appeal to the Twenty-Fourth Judicial District Court from the convictions of “Vagrancy” and “Disturbing the Peace,” trial being de novo, the defendant was found not guilty. Therefore, insofar as defendant was found guilty in the First Parish Court for the Parish of Jefferson of the offenses of “Vagrancy” and “Disturbing the Peace,” we find that the Twenty-Fourth Judicial District Court had appellate jurisdiction on appeal from the convictions, and that the defendant has been exonerated of the charges against him for said offenses. Art. VII, Sec. 36, La.Const. of 1921; State v. Cumming, 251 La. 416, 204 So.2d 769.
Defendant appeals to this Court from his conviction of the offense of “Resisting Arrest” [1] and his sentence imposed there *113 for. The record contains four bills of exceptions reserved to the rulings of the trial judge. Bills of Exceptions Nos. 2 and 4 will not be considered because they relate to defendant’s convictions of the offenses of “Vagrancy” and “Disturbing the Peace.” Our finding, infra, that Bill of Exceptions No. 3 is with merit precludes the necessity of our consideration of Bill of Exceptions No. 1 taken to the refusal of the trial judge to defer sentencing the defendant.
In his four bills of exceptions filed October 2, 1969, defendant did not pray that the testimony of record be made a part of and attached to the bills of exceptions, but, on September 12, 1969, his counsel filed a motion to complete the record. The motion was signed by the trial judge; we interpret it to mean that the entire transcript is submitted for our consideration in connection with the bills of exceptions reserved.[2]
*115 BILL OF EXCEPTIONS NO. 3.
Bill of Exceptions No. 3 was reserved when the trial judge refused to grant defendant a directed verdict.[3]
Although there is some conflict in the testimony, the evidence attached to the bills of exceptions reflects that defendant was arrested for the offense of “Vagrancy” before he allegedly resisted arrest. Defendant’s testimony is as follows:
“Q. At what point did he tell you you were under arrest ?
“A. After he had one handcuff on me, on one arm.
“Q. Are you sure he didn’t tell you that before ?
“A. I’m positive. When he got me under the arm, he said, ‘You’re under arrest, Donald.’ That’s what he told me.
“Q. And after that occurred, what happened ?
“A. Why, I told him to put the other handcuff on me, and he put them behind my back, real tight, and by that time, another — some more police cars come up, and they were standing around talking, and I seen the Sergeant we talked to a couple of nights before, and I said, ‘Sergeant, I thought this wasn’t going to happen any more,’ and when I did that, he said, ‘Get away, punk,’ and he pushed on me.
“Q. And then they took you down to jail from there?
“A. Yes.
“Q. At any time were you loud and boisterous ?
“A. Maybe I was when we were fighting, but I wasn’t, just talking to him, until he pushed on me.
“Q. And the reason you struggled with him is because he pushed on you?
“A. Yes, sir. Not ‘they,’ one of them.
*117 “Q. Which one ?
“A. Toepfer.”
Defendant testified at the time of trial that he was eighteen years of age, lived with his father, and would return to Warren Easton High School in the Fall. He said that he was working on August 3, 1968, and that immediately prior to his arrest, approximately 3:30 A.M. to 4:00 A. M., he had been riding with his girl friend, and they had had a little argument. “ * * * we had stopped to discuss it, and I had just pulled off the — you know— big street and stopped to discuss it away from the traffic and all, and I just stopped the car, and when it stops, it gets kind of hot; it don’t start easy.” He further testified that the police arrived five minutes at the most after they had parked; that they were just sitting and talking; that he was using his aunt’s car; that his car had been stolen and wrecked. As to the actions of his aunt’s car, he testified:
“A. * * * She gave me this one here to use, rather than my wrecked one.
“Q. Had this car stopped before on you like this?
“A. Yes, sure, plenty of times.
“Q. When this car stops like this, what procedure do you use to get the car back into motion ?
“A. I have to just sit there and wait for it to cool off; it just gets hot.
“Q. Will it start when it’s hot like that ?
“A. Very seldom.”
Defendant stated that he had seen Officer Toepfer three or four days before his arrest. Concerning the events which transpired at the time of the arrest and the events which transpired a few days before the arrest, his testimony is as follows:
AT THE TIME OF THE ARREST.
“Q. And what did the officer say to you or you say to the officer?
“A. He pulled up and asked me, ‘What are you doing here?’ and I said, ‘I’m just sitting here, talking, we had had a little trouble, and were just talking it out,’ and he told me, ‘Will your car start?’ and I said, ‘No, not right now,’ and he said, ‘You can’t be sitting here doing nothing; this is a bad place and kind of dark,’ and I said, T know, but my car won’t start. It’s no use trying to start it, the battery is run down, and it won’t start.’
“Q. And then what occurred ?
“A. They just kept on telling me to start it, so I got out of the car and I *119 said, ‘If I can’t do it, if you want to, you can start it,’ and then he was talking about it to the other fellow, Mr. Fulco — I mean, Henry, I don’t know his last name, but it was the blonde headed fellow, the second one on the stand. He came out around the car, and he was standing next to me, too, and the other fellow was talking, and Henry, the officer, pushed on me and said, ‘Start the car, boy,’ so when he did that, I just defended myself, and we started having a fight.
“Q. Had he placed you under arrest at that time?
“A. No, sir, he never.”
A FEW DAYS BEFORE THE ARREST.
“Q. And what occurred three or four days before?
“A. Me and my girl friend went out to eat, and we come home, and this was about 2:30 or 3 :00 o’clock, in the morning, maybe a little later, ánd we ju.st got home, and we had a knock on the door, and I opened the door and there was a policeman standing there. I didn’t know if he was a policeman, but they had police standing there, and they asked me if a girl named Connie lived there, and I said, ‘Yes,’ and he said, ‘Can I see-her ?’ and I said, ‘What ?’ and when I said that, they had three more standing behind him and. they wanted to come in. He said, ‘Where is the party at?’ and I said, ‘There ain’t no party, never was one and never will be.’ We had a little discussion back and forth, and one of them come inside and talked to me, and the others were standing outside there, talking, just discussing the matter, and they had beer in their hands. One of them asked if my car was stolen; it was parked right by the door, by the apartment, and I said, 'No, it is not stolen,’ and he said, something like, ‘We’re going to put you all in jail for doing something, being out late or disturbing something,’ I don’t know what he. said, but they just come around looking for the girls and telling me my car was stolen.” (On cross-examination, defendant stated that the officers were in plain clothes; that he had not seen Toepfer, who was in the group, before, but that his girl friend had and she told him about it the next day.)
Defendant stated that he went out with his girl friend the night after the forego *121 ing event; that when they returned to her apartment, her girl friend told him that the police had stopped and put the spot light on and off through the window; that he called the police the following day and talked with a sergeant about the matter; that the sergeant was responsive and he identified the officers to the sergeant. Thereafter, defendant was arrested by Officer Toepfer.
Thelma Brockhoff’s testimony affirms that of the defendant Lopez. With respect to her first meeting with Officer Toepfer, she said:
“It was one night me and my girl friend was walking. We had left the apartment, and they stopped us and they asked for our identification, and we didn’t have it on us, so they drove us home. I went inside to get it, and Connie was still out talking to one of the other policemen, and they said — Toepfer followed me inside, and I showed him my identification, and he left, and evidently Connie must have said for them to stay because I stayed inside, so they came in and had a Coke. They drank a Coke, and then they left, but before they left they told my girl friend to call in and tell them this was a complaint so they could stay longer, so she called and another police car came, but they said they were going to take the call. That is the first time I had seen them.”
Concerning the defendant Lopez’s arrest, Thelma Brockhoff testified:
"Q. Now, exactly what happened after Donald defended himself and pushed back?
“A. Well, they kind of all got together; they were fighting, not punching each other, but pushing, you know, and then Toepfer went around and called for the other policeman, and when he come back, he had put the cuffs on Donald, and then h.e had him over the car, one of them did, and the other one, Toepfer was calling for the other policeman to come, and right at the end of the thing, Donald had already had handcuffs on him. He told Donald he was under arrest, then, and when that happened, he had come back and Toepfer started hitting him with that black stick on the head.”
Deputy Sheriff Daniel R. Samrow, who was on routine patrol duty with Officer Toepfer on August 3, 1968, testified that they saw Donald Lopez and Thelma Brockhoff parked at Harvard and Wabash at approximately 5:30 A.M. and questioned them as to what they were doing. Lopez, who was sitting behind the steering wheel, explained that his car had run hot; he refused to start the car and told Officer Samrow that he, Samrow, could start it if *123 that was what he wanted. Officer Sam-row would not enter the car, and Lopez got out of his vehicle and started yelling and screaming at the officers. Officer Samrow stated:
“No, sir, I wasn’t telling him to remain quiet. Oh, wait now, I had asked the gentleman questions, Donald Lopez, when we first arrived at the scene, and when he got out of the car and started screaming and yelling, he was advised to remain quiet. Yes, we were asking him questions then. I did state to him in this process to get in his car and try to start the vehicle, and Thelma Brockhoff also advised him, asked him to get in the car and start it up. If the car wouldn’t have started up, we would have got assistance, but he wouldn’t do this. He continued to yell and scream, and this is when Deputy Toepfer advised him, ‘You are under arrest.’ ”
Officer Samrow said that the arrest was for “Vagrancy,” and he testified as follows :
“Q. What was the ultimate outcome of this encounter with them? What did you do next ?
“A. Okay, well, after advising him to try to start the vehicle once, he got out of the vehicle, and he started yelling and screaming at myself and Deputy Toepfer, and Deputy Toepfer was at the rear end of his car, or the rear end of the vehicle. The two cars were parked side by side, and I was standing between the vehicles with Donald Lopez, and Thelma Brockhoff was still inside the car, asking him to be quiet, and at this time, Deputy Toepfer advised him he was under arrest, and we still had not received any reply from his as why, exactly, he was back there, and he wouldn’t try to show us that his vehicle was hot and wouldn’t start.
“Upon Deputy Toepfer’s telling him he was under arrest, Donald Lopez became violent and started hitting on Deputy Toepfer, who had walked between the cars, himself.”
Officer Samrow said that a scuffle ensued, but that Lopez did not take a punch, “it wasn’t taking punches as if it would be fist fighting.”
Officer Samrow stated that Officer Toepfer was no longer with the force, having resigned approximately five months before trial. He also said that Toepfer had not been his regular partner, and that he had ridden with him for only a month.
Henry J. Toepfer, Jr., who, on August 3, 1968, was a deputy sheriff employed by the Jefferson Parish Sheriff testified that on August 3,1968, at approximately 5 :15 A.M., *125 while on routine patrol duty he and his partner were checking the area where the defendant was parked; that the area was industrial, having a few buildings in it; and that evidence of burglaries, including a few stripped cars, had been found in the vicinity. Officer Toepfer admitted that he had checked on the identification of Thelma Brockhoff and had gone to her apartment previously, and he also admitted that he had flashed a light on her apartment. He said that he knew Lopez from patrolling and observation; that he was aware of where he lived but did not know that he had a full time job. He was cognizant of the fact that Lopez was seeing Thelma Brockhoff, but he stated that he did not feel that Lopez was preventing him from seeing Thelma; that he went to her apartment to see the other party who was staying there. With respect to defendant’s arrest, he testified:
“At this time, we again asked Mr. Lopez what he was doing in the area, and he wanted to know why we needed to know what he was doing there. He said his car broke down, and we said, ‘What were you doing in this area before?’ So Mr. Lopez got extremely excited and started to use loud and insulting language towards myself, and at this time, I advised him he was under arrest. Then Mr. Lopez started to charge at me, saying he was going to hit me and a few other things, and my partner and I wrestled with him, and we placed him on the hood where we handcuffed him. At this time, Miss Brockhoff, who was sitting inside the vehicle, started to run around and said, ‘Don’t hurt him, don’t hurt him,’ and at this time one of the other units came up to the scene, and we separated the two defendants and tried to ask them what they were doing in the area, and they still wouldn’t talk to us.
“We transferred them both to the East Bank Jail. I took one, and Deputy Taffaro took the other, and we booked them.”
Deputy Craig Taffaro testified that he was called to the scene of defendant’s arrest, and that when he arrived the defendant was already handcuffed. He said that he knew Thelma Brockhoff before August 3, 1968; that he thought he had seen her in Officer Toepfer’s presence prior to defendant’s arrest.
Defendant contends herein that the prejudicial failure to grant his motion for a directed verdict of acquittal on “Vagrancy,” and consequently on “Disturbing the Peace,” prejudiced him further, by forming a prejudicial foundation to find him guilty on Count No. 3, “Resisting an Officer.” He avers that the trial court further prejudiced him by failing to take into account that as a matter of equity and law: (1) A defendant has a legal right to resist an unlawful arrest; (2) A citizen has a right to *127 defend himself; and (3) Every male citizen has a legal right, a legal duty, a God given right to protect a lady he is escorting, and particularly against any persons who prior had molested her, as admitted by her molestor, in the person of the arresting officer, Deputy Toepfer. He argues that the trial court erred and seriously prejudiced him by failing to take into consideration the entire situation; the proven antipathy of the arresting deputy toward the defendants, and the apparent physical danger with which he threatened the defendants, all of which constitutes further error and error patent on the face of the record.
The State submits that the police had probable cause to arrest the defendant. It argues that once probable cause is established, the defendant’s contention that he had a right to resist an arrest is without merit. It further submits that probable cause is a conclusion of fact, and that, therefore, a wide discretion is allowed to the trial judge.
Initially, we note that in his Per Curiam to Bill of Exceptions No. 3, the trial judge remarked, “In connection with the charge of ‘Resisting an Officer’, a review of this record does not reflect that a Bill of Exception was reserved.” We note that Bill of' Exceptions No. 3 makes in substance the same averments as are made in this Court. It recites that the defendant had a legal right to resist an unlawful arrest, and that the State has failed to prove, by even a scintilla of evidence, all three counts of the bill of information.
Article 213 of the Code of Criminal Procedure provides:
“A peace officer may, without a warrant, arrest a person when:
“(1) The person to be arrested has committed an offense in his presence, and if the arrest is for a misdemeanor it must be made immediately or on close pursuit;
“(2) The person to be arrested has committed a felony, although not in the presence of the officer;
“(3) The peace officer has reasonable cause to believe that the person to be arrested has committed an offense although not in the presence of the officer ; or
“(4) The peace officer has received positive and reliable information that another peace officer holds a warrant for the arrest.”
“Reasonable belief — or ‘probable cause’, as it is termed under the federal standard — to make an arrest without a warrant exists when the facts and circumstances within the arresting officer’s knowledge, and of which he has reasonably trustworthy information, are sufficient in themselves to justify a man of *129 average caution in the belief that a felony has been or is being committed.
* * *
“Compliance with these standards is, in the first instance, a substantive determination to be made by the trial court from the facts and circumstances of the case. * * *
“And in determining compliance with these standards it is not the proof required for conviction which concerns us. Proof required to satisfy the requirement of reasonable belief or probable cause is less and is what the terms imply: probabilities and practical considerations of everyday life on which reasonable men could reasonably be expected to act. * * State v. Johnson, 249 La. 950, 192 So.2d 135, 141. See, State v. Pebworth, 251 La. 1063, 208 So.2d 530.
We do not find from the testimony narrated and quoted, supra, that there was probable cause for defendant’s arrest. He and his companion were known to the arresting officer; they were not strangers in the area. Defendant was suspected of no burglary; the officers did not testify to knowledge of a burglary immediately prior to defendant’s arrest. No complaints had been made against defendant and his girl friend; no one in the area had complained about their parking. Defendant was not a suspicious character; he was not a wanted figure. The testimony, supra, discloses that the officers had no trustworthy information that the defendant had committed any offense or was about to commit one. We do not find that a man of reasonable and average caution, possessing the knowledge of the defendant Lopez which Officer Toepfer possessed, would have arrested the defendant. As stated supra, Officer Toepfer knew where the defendant lived and knew where his car was registered. We conclude that defendant’s arrest was illegal. This fact is substantiated by his exoneration in the Twenty-Fourth Judicial District Court. See, State v. Pagnotta, 253 La. 770, 220 So.2d 69; State v. Washington, 252 La. 359, 211 So.2d 290; 6 C.J.S. Arrest § 6 d., p. 596. Cf. Lyons v. Carroll, 107 La. 471, 31 So. 760.
Having found that defendant’s arrest was illegal, it follows that he neither resisted arrest nor unlawfully opposed an officer. Under the facts and circumstances of the case, defendant merely asserted his constitutional rights in his encounter with the arresting officer and his partner. “A prosecution will not lie for resisting an officer where the officer is attempting to make an unlawful arrest.” City of Monroe v. Ducas, et al., 203 La. 971, 14 So.2d 781. Cf. State v. Scott, 123 La. 1085, 49 So. 715.
For the reasons assigned, the motion for a directed verdict is maintained; the conviction and sentence are annulled and set *131 aside, and the defendant is ordered discharged. See, State v. Gatlin, 241 La. 321, 129 So.2d 4.
BARHAM, J., concurs in the result.

. “Resisting an officer is the intentional opposition or resistance to, Qr obstruction of, an individual acting in his official capacity and authorized by law to make a lawful arrest or seizure of property, or to serve any lawful process or court order, when the offender knows or has reason to know that the person arresting, seizing *113 property, or serving process is acting in his official capacity.
“The phrase ‘obstruction of’ as used herein shall, in addition to its common meaning, signification and connotation mean:
“(b) Any violence toward or any resistance or opposition to the arresting officer after the arrested party is actually placed under arrest and before ho is incarcerated in jail.
“ * * *
“Whoever commits the crime of resisting an officer shall be fined not more than five hundred dollars or be imprisoned for not more than six months, or both.” LSA-R.S. 14:108.

. The motion to complete the record recites :
“ON MOTION of Donald Lopez, appearing herein through his undersigned counsel, and on suggesting to the Court that the Court has furnished mover with what purports to be a transcript of tbe proceedings on the trial had before the Honorable Judge Cyril Graeianette, and that upon examination and perusal of said transcript, it is patent that said transcript is incomplete, and omits material crucial to the prosecution of mover’s appeal, and more particularly, fails to disclose that Mover, upon conviction, moved the Court for a deferral of sentence, to afford his counsel an opportunity to prepare written motion for a new trial and a motion in arrest of judgment, a judicial denial of due process of law, fair trial, and the right to counsel as provided by the Sixth and Fourteenth Amendments to the Constitution of the United States of America and like provisions of the Constitution of the State of Louisiana of 1921, as amended ; and
“On suggesting to the Court that it is essential to the prosecution of movers appeal herein that he be furnished within a reasonable time with all missing portions of the transcript of the proceedings referred to herein, and
“On suggesting that the return date for his said appeal be extended for a period of fifteen days from the date on which the missing portion of the transcript is delivered to Mover’s Counsel:
“IT IS ORDERED that all missing portions of the transcript of the proceedings had before the Honorable Judge Cyril Graeianette in the matter of the State of Louisiana vs. Donald Lopez, Docket No. 63184, consolidated with the State of Louisiana vs. Thelma S. Brockhoff, Docket No. 63162, be transcribed forthwith, and be delivered to Mover’s Counsel within a reasonable time, and that the return date of his appeal be and it is hereby extended for a period of twenty-one days *115 from the date upon which said transcript is furnished to Mover’s Counsel.
“Jefferson Parish, Louisiana
“September t?Ah, 1969.
[Sgd] “C. J. Gracianette
“JÜDG E”

. “In a jury trial the court may direct a verdict of not guilty of one or more of the offenses charged, on its own motion or on that of a defendant, after the close of the state’s evidence or of all the evidence, if the evidence is insufficient to sustain a conviction.
“In a trial by the judge alone the court shall enter a judgment of acquittal on one or more of the offenses charged, on its own motion or on that of a defendant, after the close of the state’s evidence or of all the evidence, if the evidence is insufficient to sustain a conviction.
“If the court denies a defendant’s motion for a directed verdict or judgment of acquittal at the close of the state’s case, the defendant may offer his evidence in defense.” Art. 778, C.Cr.P. See, State v. Hudson, 253 La. 992, 221 So.2d 484, 499.