598 So.2d 1171 (1992)
STATE of Louisiana
v.
Robert B. McHUGH, et al.
No. KW 91 0664.
Court of Appeal of Louisiana, First Circuit.
April 10, 1992.
Rehearing Denied May 28, 1992.
Anthony Thibodeaux, Berwick, for McHugh.
Bernie B. Boudreaux, Dist. Atty., Walter J. Senette, Asst. Dist. Atty., Franklin, for State.
Before SHORTESS, LANIER and CRAIN, JJ.
CRAIN, Judge.
Defendants separately were charged by bills of information with possession of untagged deer meat, violations of La.R.S. 56:125(B). Defendants pled not guilty and filed motions to suppress the evidence and statements. After hearing testimony on the motions, the trial court denied the motions. Upon defendants' request, the trial court stayed the proceedings; and defendants *1172 filed an application with this Court seeking a review of the trial court's decision. We issued a writ of certiorari and ordered the parties to file briefs and appear for oral argument.
On November 18, 1990, defendants were issued citations for possession of untagged deer meat after being stopped in the Intracoastal Waterway near Bayou Chene in St. Mary Parish by agents of the Louisiana Department of Wildlife and Fisheries. Robert C. McHugh; his wife, Billie McHugh; their son, Robert B. McHugh; and a friend, Michael Moore, had spent the weekend at the McHugh camp. On the way back to the landing, the McHugh family and Mr. Moore travelled together in one boat. They were followed by a boat in which Kernis Peltier, a longtime hunting companion of the senior Mr. McHugh, and Sandy Sonnier rode.
As the two boats approached the Amelia boat ramp, at some time between 10:30 a.m. and noon, Sergeant Donald Miculek, an agent with the Department of Wildlife and Fisheries, motioned for the boats to stop. At that location, Sgt. Miculek and five other Wildlife and Fisheries agents were conducting game violation and boat safety checks. Because of the number of duck hunters who had killed their limit on the previous day, the agents had decided to check hunters in the area for what was referred to as "duck tripping." Lt. Wayne Vidos was supervising the agents; and he instructed Sgt. Miculek to stop the two boats containing the McHugh party, along with a third boat. Lt. Vidos testified that he "probably [would] have stopped [the boats] anyway," but he specifically wanted to stop these three boats because of the configuration in which they were traveling. He explained that game violators occasionally travel in such a manner, using a lead boat to detract the attention of the agents. As it turned out, the third boat was not with the McHugh party. Lt. Vidos testified that the "primary" and "main" purpose behind stopping these boats was to check for game violations, especially "duck tripping." The secondary reason for the stop was to check for boat and safety violations. Lt. Vidos also explained at the hearing that he recognized the senior Mr. McHugh. The two men were neighbors and, during the previous year, Lt. Vidos had once stopped Mr. McHugh and had found him to be in violation of the rabbit tagging requirements, although he did not cite Mr. McHugh for the offense. Lt. Vidos also was aware that, in 1975, Mr. McHugh had committed a night hunting violation.
After the boats had stopped, Sgt. Miculek asked the occupants if they had been hunting or fishing. Someone on the McHugh boat replied that they had been hunting (with the exception of Mrs. McHugh who did not hunt) and that Mr. Moore had killed a deer. The agents observed a buck head in the boat's live well; and, after the occupants of the boat let the agents look inside the ice chest, the agents found that the deer was fully dressed and quartered. Because the deer was not tagged, the agents issued citations to the occupants of both the McHugh and Peltier boats.
After hearing testimony, the trial court denied defendants' motions to suppress. The trial judge reasoned that, pursuant to La.R.S. 34:851.29, Wildlife and Fisheries agents may stop vessels at any time to examine the boats for compliance with safety statutes. The court implied that, because of this authority, the agents also can stop to check for any possible game violations without the necessity of having probable cause or reasonable suspicion that a violation has occurred.
La.R.S. 34:851.29 statutorily authorizes Wildlife and Fisheries agents to stop boats under the following circumstances:
It shall be the duty and responsibility of every wildlife agent and peace officer of this state and its subdivisions to enforce the provisions of this Part [which requires special safety equipment on vessels and proscribes certain conduct by boat operators, such as operating a vessel while intoxicated], and in the exercise thereof, they are hereby authorized to stop and board any vessel for the purpose of addressing inquiries to those on *1173 board, requiring appropriate proof of identification therefrom, examining the certificate of numbers issued under this Part or in the absence of such certificate requiring appropriate proof of identification of the owner or operator of the vessel, and in addition, examining such vessel for compliance with this Part. Officers so boarding any vessel shall first identify themselves and such officer in the performance of his duties shall be without liability for trespass.
A special statute also authorizes agents to "inspect ..., with or without search warrant, records, ... boat, ... or any place of deposit for wild birds, ... whenever there is probable cause to believe that a violation has occurred." La.R.S. 56:55(A).
In the application for writs, defendants argue that the trial court's ruling was in error and that evidence seized from them should be suppressed. Specifically, defendants assert that the trial court erred in holding that Wildlife and Fisheries agents may randomly stop people riding in a motorboat to investigate possible game violations without first having at least a reasonable suspicion that the suspects were engaged in criminal activity. Defendants also claim that "dragnet checkpoint blockades" conducted by Wildlife and Fisheries agents are illegal under the Louisiana Constitution and that, even if checkpoint stops by Wildlife and Fisheries agents are legal under the Louisiana Constitution, the checkpoint stop in the instant case is illegal because it did not comply with federal constitutional requirements. Finally, defendants assert that statements made by them to the Wildlife and Fisheries agents should be suppressed as fruits of the illegal stop and search and because defendants were not advised of their constitutional rights before the statements were made.
In response, the prosecution contends that the agents had reasonable suspicion that defendants were engaged in criminal activity and, thus, were justified in detaining defendants. The state further argues that, once defendants were properly detained, the agents' subsequent search of the boat and seizure of evidence was justified under several theories: some of the evidence was in plain view; defendants consented to the search; probable cause for the search existed; and the automobile exception to the warrant requirement applied. Alternatively, the state asserts that, even if the agents did not have reasonable suspicion to stop defendants, the stop was legal because Wildlife and Fisheries agents are authorized by legislation to stop vessels at any time and without any supporting facts to conduct boating safety checks. In connection with this argument, the state maintains that decisions of the Louisiana Supreme Court which proscribe the use of evidence secured at sobriety checkpoint and roadblock stops in DWI cases do not apply to wildlife inspections.
In an amicus curiae brief filed with the permission of this Court, the Louisiana Department of Wildlife and Fisheries states that resolution of the issues presented in defendants' writ application is "of the utmost importance" to the Department. The Department asserts that "[g]iven the greatly increased pressure on our wildlife resources and the need for more wildlife enforcement, the authority of wildlife enforcement agents to make random stops in the field and to perform game checks without the need for a warrant or probable cause in the strictest sense must be recognized and upheld." The Department concludes that random investigatory stops by Wildlife and Fisheries agents are not "unreasonable" under either the United States or Louisiana constitutions.
The Fourth Amendment to the federal constitution protects people against "unreasonable searches and seizures." See also La.Const. art. I, § 5. The protection applies to a seizure of the person, including a brief investigatory stop such as that involved in the stop of a vehicle or a vessel. Moresi v. Department of Wildlife & Fisheries, 567 So.2d 1081, 1086 (La. 1990). See also Brower v. County of Inyo, 489 U.S. 593, 109 S.Ct. 1378, 1381, 103 L.Ed.2d 628 (1989) (a Fourth Amendment seizure occurs "when there is a governmental termination of freedom of movement *1174 through means intentionally applied") (emphasis omitted).
Agents of the Department of Wildlife and Fisheries are "vested with the same authority and powers conferred by law upon other law enforcement officers." La.R.S. 56:55.2(A). Article 215.1 of the Louisiana Code of Criminal Procedure, as well as federal and state jurisprudence, recognizes the right of a law enforcement officer to temporarily detain and interrogate a person whom he reasonably suspects is committing, has committed, or is about to commit a crime. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); State v. Lanter, 391 So.2d 1152, 1153 (La.1980). Reasonable suspicion for an investigatory detention is something less than probable cause and must be determined under the facts of each case by whether or not the officer had sufficient knowledge of facts and circumstances to justify an infringement on the individual's right to be free from governmental interference. Lanter, 391 So.2d at 1153-54. The totality of the circumstances must be considered in determining whether or not reasonable suspicion exists. State v. Payne, 489 So.2d 1289, 1291-92 (La.App. 1st Cir.), writ denied, 493 So.2d 1217 (La. 1986).
In arguing that the agents in the instant case had reasonable suspicion to make the initial stop of defendants' vessels, the state relies on the following facts. The agents stopped defendants in an area known for game violations. Further, on the prior day, numerous hunters came into the landing with both their own duck limits and the limits for other hunters who remained in the field. Thus, the agents suspected that some of these hunters who had remained in the field would come in with more ducks and be found to have exceeded their limit. The boats involved herein were traveling in a "Y" formation, which is known by the agents to be used to elude detection. Additionally, the agents knew that the senior Mr. McHugh had a record for being a game violator. Finally, numerous citations had been written in the area on the day before.
We find that, under these facts, the agents did not have reason to suspect that defendants had been engaged in criminal conduct. Sgt. Miculek candidly admitted that, prior to stopping defendants, he had no reason to believe that defendants had committed a game violation. Although the reputation of an area is a factor to consider in determining the existence of reasonable suspicion, this factor alone is insufficient to justify a stop. Merely because the agents suspected that some of the hunters in the area would attempt to exceed their limit on ducks that date did not give the agents reason to suspect that defendants had committed any offense. At no time did the agents observe any indication that defendants were transporting more than their daily limit of ducks. See Moresi, 567 So.2d at 1087. Indeed, at the time the agents decided to stop defendants, the agents had no reason to even believe that these individuals had been hunting. Furthermore, while some of these defendants had been deer hunting, they had not been duck hunting. Accordingly, we reject the state's claim that reasonable suspicion supported the stop in this case.
Alternatively, the state argues that the stop and search conducted in the instant case was legal because Wildlife and Fisheries agents are authorized to conduct wildlife inspections and boating safety checks without the necessity of possessing either probable cause or reasonable suspicion. Defendant characterizes the stop as being a "checkpoint" stop and, thus, prohibited by the Louisiana Supreme Court's decision in State v. Church, 538 So.2d 993 (La.1989), which held that DWI checkpoint stops are illegal under the Louisiana Constitution.
In Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), the United States Supreme Court held that random stops of motorists without articulable or reasonable suspicion of unlawful activity were unreasonable seizures under the Fourth Amendment, and signalled the need for "neutral criteria" to curb the unbridled discretion of police officers in making such stops. Prouse suggested roadblocks for *1175 all traffic as an alternative to random stops. See Church, 538 So.2d at 996. Subsequently, in Michigan Department of State Police v. Sitz, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), the Court upheld the use by Michigan of a sobriety roadblock which involved a very brief detention of each motorist passing through the checkpoint and which was conducted pursuant to detailed guidelines which limited the discretion of the officers involved.
Relying upon the Louisiana Constitution, the Louisiana Supreme Court has not followed the direction of the United States Supreme Court in this area. In State v. Parms, 523 So.2d 1293, 1303 (La.1988), the Louisiana Supreme Court found a DWI sobriety checkpoint stop to be illegal because it did not comply with the federal standards; but the Court also noted that it was "doubtful" the roadblocks could "ever pass muster" under the Louisiana Constitution. Later, in Church, the Supreme Court specifically held that, even if a DWI sobriety checkpoint complies with federal constitutional requirements, use of the roadblock is unconstitutional under the Louisiana Constitution. The Court reasoned that Article I, Section 5, of the Louisiana Constitution protects against "unreasonable searches, seizures, and invasions of privacy" and, thus, does not duplicate the Fourth Amendment. "It represents a conscious choice by the citizens of Louisiana to give a `higher standard of individual liberty than that afforded by the jurisprudence interpreting the federal constitution.'" Church, 538 So.2d at 996 (quoting State v. Hernandez, 410 So.2d 1381, 1385 (La.1982)).
In reaching its decision, the Supreme Court in Church recognized that the drunken driver was a pervasive problem in society causing the loss of thousands of lives and extensive property damage. However, the Court concluded, after examining statistics, that the roadblocks had, at best, only a marginal effect on the problem of drunken driving. "Thus, the effectiveness of roadblocks is questionable, especially when weighed against other measures less intrusive on individual privacy, such as roving patrols which act only when there is an articulable basis for a stop." 538 So.2d at 997.
In Moresi v. Department of Wildlife & Fisheries, the Supreme Court recognized, but did not resolve, the issue present in the instant case. In reviewing a judgment rendered in a lawsuit filed by duck hunters seeking damages for the alleged violation of their civil rights by Wildlife and Fisheries agents, the Court reversed the judgment and concluded "that the game agents' conduct on January 11, 1986 did not violate any clearly established state constitutional rights of the plaintiffs of which a reasonably competent public official should have known." 567 So.2d at 1094. This ruling was obviously based on the fact that Church was not decided until 1989. However, the Court questioned the legality of checkpoint or random stops by game wardens under both the federal and the state constitutions. The Court stated that "[i]t was not clear at the time of these searches, and is still not today, whether the constitution or federal law prohibits game agents from making random or checkpoint stops in the marsh for the purpose of ensuring compliance with hunting and fishing laws," and that "reasonable jurists may disagree as to whether the Church-Parms holding involving motor vehicle sobriety checkpoints is directly and fully controlling with respect to game agents' stops of sportsmen in the marsh for questioning with respect to possible game or boating violations." 567 So.2d at 1087 & 1094. Thus, the issue presented in this writ application is res nova.
After reviewing the facts of this case, we conclude that the stop of defendants' boats was conducted illegally under the Louisiana Constitution, as interpreted in Church.[1] We agree with the Department of Wildlife and Fisheries that preservation of our wildlife is necessary and that game *1176 wardens need effective methods at their disposal to preserve our limited resources.[2] However, while some testimony relative to the effectiveness of these patrols was introduced, mainly during cross-examination of the agents, the state made no attempt to establish specific details relative to the number of boats stopped which are found to be in violation of game or safety statutes compared to the number of boats which are not in violation. See Church, 538 So.2d at 997. Although over forty citations were issued that day, there is no indication how many boaters were stopped who were not issued any citations. The state also made no attempt to establish that less intrusive methods were not available to accomplish the goals set for the series of stops which resulted in this case.
Even if we were to hold that, because of the peculiar nature of wildlife enforcement, game wardens can conduct either checkpoint or random stops of hunters and fishers, thereby distinguishing Church and limiting its ruling to sobriety checkpoints of motorists, we still would not be able to uphold the stop and search conducted in this case. Defendants characterize the stop as being a "checkpoint" stop. The agents, however, testified that it was not a roadblock or checkpoint stop. In the amicus brief, the Department of Wildlife and Fisheries refers to these type stops as being "random." No matter which label is attached to the stop, the discretion of the agents in this case was unbridled. According to the agents who testified, the Department of Wildlife and Fisheries provided the agents with no manual or guidelines to use in conducting these kind of stops. The discretion of the agents was not governed by neutral criteria and the boats were not stopped in a systematic way. See Parms, 523 So.2d at 1302. When the agents were too busy to stop each passing boat, the agents had unconstrained discretion to determine which boats would be stopped.
Under these circumstances, we conclude that the state did not meet its burden of proof. See La.C.Cr.P. art. 703(D). The seizure of defendants was unreasonable and without reasonable suspicion or probable cause to believe that they had violated some law. Thus, the seizure was unconstitutional under Article I, Section 5, of the Louisiana Constitution. For the foregoing reasons, the judgment of the trial court is reversed and the motions to suppress filed by defendants are granted. Because we find that the illegality of the initial stop requires suppression of the statements, it is unnecessary for us to consider defendants' additional argument seeking suppression of the statements on the basis of alleged Miranda violation.
JUDGMENT OF DISTRICT COURT IS REVERSED AND MOTIONS TO SUPPRESS ARE GRANTED. CASES ARE REMANDED TO THE DISTRICT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.
LANIER, J., concurs in the result and assigns reasons.
LANIER, Judge, concurring.
I concur in the result.
La.R.S. 34:851.29 is unconstitutional insofar as it is in conflict with the United States Supreme Court decision of Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) and the Louisiana Supreme Court decision of State v. Parms, 523 So.2d 1293 (La.1988).
NOTES
[1] Previous decisions by this Court show that we did not agree with the approach taken by the Louisiana Supreme Court in Church. See City of Baton Rouge v. Dyson, 536 So.2d 1297 (La. App. 1st Cir.1988), rev'd, 538 So.2d 605 (La. 1989). See also State v. Parms, 515 So.2d 464 (La.App. 1st Cir.1987), rev'd, 523 So.2d 1293 (La.1988).
[2] We must point out that the logic of the position simply does not stand scrutiny. Although the preservation of wildlife is extremely important, we cannot say that its importance exceeds that of human life, requiring us to suspend constitutional rights in wildlife cases, but not in cases involving drunk drivers or narcotics violations. Additionally, we cannot concede that government regulation of the privilege of hunting and fishing exceeds governmental regulation of the privilege of driving. See W. La Fave, Search & Seizures, Sec. 10.8(e) (1987 and Supplement 1992).