630 So.2d 1259 (1994)
STATE
v.
Robert McHUGH, et al.
No. 92-KK-1852.
Supreme Court of Louisiana.
January 6, 1994.
*1261 Richard P. Ieyoub, Atty. Gen., Bernard E. Boudreaux, Jr., for applicant.
Anthony Thibodeaux, for respondent.
Donald E. Puckett, Thomas M. Landrum, for Dept. of Wildlife and Fisheries amicus curiae.
Richard P. Ieyoub, Atty. Gen., Carol A. Jewell, for Attorney General Richard Ieyoub amicus curiae.
Berkley E. Rhorer, for Wildlife Federation amicus curiae.
W. Brian Babin, for East Ascension Sports League amicus curiae.
Marc Dupuy, Jr., for Louisiana Operation Game Thief amicus curiae.
DENNIS, Justice.[*]
This case presents the question of whether a wildlife law enforcement officer may make a suspicionless stop of a hunter leaving a wildlife habitat during hunting season and detain him briefly to ascertain whether he has a valid hunting license, to ask whether he has game in his possession, and, if so, to request to inspect the game. After being subjected to such a stop, the defendants freely and voluntarily acknowledged their possession of game and allowed a wildlife officer to inspect a dressed and quartered buck deer in their ice chest. Because the divided deer portions were not tagged as required by law, La.R.S. 56:125, the officer charged the defendants with statutory violations. The defendants moved the trial court to suppress the evidence and statements obtained during the stop. The trial court denied their motion, but the court of appeal granted a writ, reversed, and ordered the evidence and statements suppressed. State v. McHugh, 598 So.2d 1171 (La.App. 1st Cir.). We granted certiorari. 605 So.2d 1105 (La.1992). We reverse the court of appeal judgment and remand the case to the trial court for a trial or other proceedings. Because the defendants were exiting a wildlife area during hunting season under circumstances clearly indicating that they had been hunting and possibly had game in their possession, it was not an unreasonable search, seizure or invasion of privacy under either the state or federal constitution for the game agents to stop the defendants briefly for the limited purpose of demanding that they exhibit their hunting licenses, ask if they had any game, and request to inspect the game in their possession.

I.
On November 18, 1990, six wildlife law enforcement officers in three vessels were stopping and checking boat loads of hunters headed toward the Bayou Boeuf landing on the Intracoastal waterway. The officers' primary objective was to detect persons engaged in "duck tripping", a method frequently used by game law violators to smuggle illegally taken ducks from hunting areas. The violator usually divides his excess ducks into one or more groups, each of which can be made to appear as a hunter's legal daily bag limit. After attaching to each "limit" a tag indicating the species, date and place of taking, and hunting license number and signature of the taker as required by law, La. R.S. 56:124(6) (repealed by 1992 La. Acts No. 966, § 2; see now La.R.S. 56:116.1(B)(8)); 50 C.F.R. § 20.36, the outlaw arranges to have each limit ferried separately to the landing in several trips by another hunter. Game law enforcement officers attempt to foil suspected "duck tripping" schemes by consistently checking and recording the signatures on duck tags of limits being transported from the hunting areas. By this means agents often can determine whether hunters have taken and tagged more than their daily bag limits.
The officers began to suspect that "duck tripping" was under way at the Bayou Boeuf landing on November 17, 1990, the first day of the duck season, when they noticed that a large number of boats using the landing were being operated by single hunters carrying other hunters' tagged limits. Accordingly, the officers began to record the names of hunters shown on the duck tags so as to detect and apprehend any hunter sending out more than one daily bag limit. The six officers continued this process on the following *1262 day, November 18th, by stopping and checking every boat that passed headed toward the landing. Occasionally, however, when traffic became heavier than they could handle expeditiously, the officers would allow some boats to pass unchecked.
At about 10:30 a.m., the officers stopped the defendants' two boats as they were headed toward the landing. Although there were some inconsistencies in the testimony, it seems most probable that the events unfolded as follows. One or two of the officers waved down or pulled alongside the defendants' lead boat and demanded to see the occupants' hunting licenses. After the defendants complied with this request, an officer asked them if they had any ducks. When they replied in the negative, the officer inquired if they had any other game in their possession. The hunters responded that one of them had killed a deer and pointed to the head of a buck deer in the well wash of one of the boats. The officer asked for and obtained permission to come aboard to examine the deer. After viewing the deer head, the officer asked whether the defendants had the body of the animal. The hunters acknowledged that they did, voluntarily opened an ice chest and displayed the dressed and quartered deer. Upon observing that there were no visible tags on the deer meat, the officer issued summonses charging the defendants with violating La.R.S. 56:125, which prohibits the division of a deer in the field, unless each portion is identified by the name, address, and license number of the slayer, and the sex of the animal, except as to portions cut from the carcass for consumption in camp.
The defendants moved to suppress any evidence or inculpatory statements obtained from them by the wildlife law enforcement officers on the ground that the search and seizure violated their state and federal constitutional rights. After a hearing, the trial court denied the motion to suppress, finding that the officers' primary reason for stopping the defendants was to look for game violations, but concluded that the officers were authorized to stop the hunters to check their boats for safety violations under La.R.S. 34:851.29.
The court of appeal granted certiorari and held that the initial stop of the defendants by the wildlife law enforcement officers violated Article I, § 5 of the Louisiana Constitution, concluding that a stop for a license check and game inquiry is constitutional only if the enforcement officer reasonably suspects the presence of illegally taken or tagged game or the absence of a valid hunting license on the basis of articulable facts. State v. McHugh, 598 So.2d 1171 (La.App. 1st Cir.1992). We reverse and remand.

II.
Article I, § 5 of the Louisiana Constitution provides:
§ 5. Right to Privacy
Section 5. Every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy. No warrant shall issue without probable cause supported by oath or affirmation, and particularly describing the place to be searched, the persons or things to be seized, and the lawful purpose or reason for the search. Any person adversely affected by a search or seizure conducted in violation of this Section shall have standing to raise its illegality in the appropriate court.
Subject only to a few exceptions that were specifically established and well-defined prior to the adoption of our state constitution, a search, seizure or invasion of privacy conducted without a warrant issued upon probable cause is constitutionally prohibited. State v. Moreno, 619 So.2d 62 (La. 1993); State v. Hernandez, 410 So.2d 1381 (La.1982); State v. Banks, 363 So.2d 491 (La.1978); State v. Fearn, 345 So.2d 468 (La.1977); State v. Gordon, 332 So.2d 262 (La.1976). Once a defendant makes an initial showing that a warrantless search or seizure occurred, the burden of proof shifts to the state to affirmatively show that it was justified under one of the narrow exceptions to the rule requiring a search warrant. State v. Banks, supra; State v. Franklin, 353 So.2d 1315 (La.1978).
*1263 It is undisputed that the stop in the present case was not authorized by a warrant. The state contends, however, that the stop was justified and came within an established exception to the warrant requirement, viz., the "investigatory stop" exception. A law enforcement officer may stop a person in a public place whom he reasonably suspects is committing, has committed, or is about to commit an offense and may demand of him his name, address, and an explanation of his actions. State v. Moreno, supra; State v. Lanter, 391 So.2d 1152 (La.1980); State v. Bolden, 380 So.2d 40 (La.1980); La.C.Cr.P. Art. 215.1; see Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Therefore, an investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be engaged in criminal activity, or there must be reasonable grounds to believe that the person has committed or is wanted for past criminal conduct. State v. Moreno, supra; Moresi v. Dept. of Wildlife & Fisheries, 567 So.2d 1081 (La. 1990).
The state failed to carry its burden of showing that the wildlife agents' detention of the defendants came within the "investigatory stop" exception. The record clearly indicates that when the defendants arrived, the officers were still engaged in the process they had begun the previous day of indiscriminately stopping as many boats as possible to check licenses and inquire about game in hunters' possession. The principal purpose of each stop was to record the names of hunters appearing on tags attached to ducks in each boat for comparison with such data taken from other boats transporting ducks to the landing. The officer in charge testified that he observed some circumstances about the defendants that he considered to be suspicious. He acknowledged, however, that the defendants more than likely would have been stopped even in the absence of these circumstances as part of the officers' attempts to detect "duck tripping". Moreover, we agree with the court of appeal that those circumstances did not constitute sufficient grounds to reasonably suspect the defendants of criminal activity. See State v. McHugh, 598 So.2d at 1174. Accordingly, we conclude that the state failed to show that the officers had any reasonable basis to suspect the defendants of wrongdoing or that the agents had any reason for the stops other than to check the defendants' hunting licenses and to inquire about game in their possession.

III.
Alternatively, the state argues that the wildlife law enforcement officers were authorized by regulatory statutes to make suspicionless stops of persons engaged in hunting activities to check their licenses and inquire about game taken. The statutes, in pertinent parts, provide:
Wildlife agents shall see that every person dealing in any way in any of the wildlife, fish, and game of the state in territory assigned to him for which a license must be obtained, has in his possession, and is the owner of, an official license. La.R.S. 56:54(A).
[W]ildlife agents ... may, without a warrant, arrest any person violating any of the laws or regulations under the jurisdiction of the department ... and may immediately take such person in custody for examination or trial before any officer or court of competent jurisdiction.... La. R.S. 56:54(B).
[A] wildlife agent may visit, inspect and examine, with or without search warrant... any ... boat ... for wild birds, wild quadrupeds, fish or other aquatic life or any parts thereof whenever there is probable cause to believe that a violation has occurred. La.R.S. 56:55(A).
In view of the vast expanse of marsh and isolated wildlife habitat extant throughout the state, and to facilitate the effective protection of private and public rights and property, particularly in but not limited to, these isolated areas, duly commissioned wildlife officers and agents of the enforcement division ... shall, in addition to the authority otherwise conferred by law upon such officers, be vested with the same authority and powers conferred by law upon other law enforcement officers of this state.... La.R.S. 56:55.2(A).
No person shall at any time, hunt, take, possess, or cause to be transported by any *1264 other person any wild bird or any wild quadruped, unless he is at the time of such act the lawful holder of an effective license for that purpose issued to him by authority of the Louisiana Wildlife and Fisheries Commission. La.R.S. 56:103(A).
Every license shall by its terms be effective only during the open season for the particular kinds of wild birds and wild quadrupeds authorized thereby to be taken. Every such license shall be personal to the person to whom issued and shall not be assigned or transferred to, or used by, any other person. Every officer authorized to enforce the provisions of this Subpart shall take possession of any license found in the possession of any person other than the one to whom issued and deliver it to the department to be cancelled. The license shall thereupon be null and void. Licensees shall have licenses in their possession when hunting and shall exhibit them on demand of any person authorized to enforce the provisions of this Subpart. La.R.S. 56:103(E).
Persons and vessels engaged in an activity for which a license is required must have in their immediate possession ... a valid, original license and shall show such license upon demand to a duly authorized agent of the department. La.R.S. 56:301.1(B).

A.
An individual's right to privacy is protected not only by the warrant clause of Article I, § 5 of the Louisiana Constitution, which requires that an officer have probable cause and a warrant, or be able to show the existence of an established exception, before conducting a search or seizure of the individual's person or things. His right to be left alone, to be free of unjustified governmental interference with his mind, body or autonomy, is also protected by Article I, § 5's reasonableness clause, which secures an individual from any unreasonable invasion of privacy. State v. Perry, 610 So.2d 746 (La.1992); Hondroulis v. Schuhmacher, 553 So.2d 398 (La.1989). See Devlin, Privacy and Abortion Rights Under the Louisiana State Constitution, 51 La.L.Rev. 685 (1991); Devlin, Louisiana Constitutional Law, Developments in the Law 1989-1990, 51 La.L.Rev. 295 (1990).
The right to privacy is not absolute, however. Limited governmental interference is permitted by Article I, § 5's warrant and reasonableness clauses. In most criminal cases, the permissibility of a particular intrusion depends on the prerequisite of probable cause and a warrant, or the existence of an established exception to these requirements. Further, where a privacy right intrusion is sufficiently less intrusive than an arrest and serves special government needs outside of the ordinary law enforcement context, such an infringement on that right may be justified by regulations adopted to serve compelling state interests that cannot be achieved through means significantly less restrictive of privacy freedoms. See State v. Perry, supra; Hondroulis v. Schuhmacher, supra; Kramer v. Union Free School Dist., 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Aptheker v. Secretary of State, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964); Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); People v. Medina, 705 P.2d 961, 975 (Colo.1985); Guardianship of Roe, 383 Mass. 415, 421 N.E.2d 40 (1981). In the present case, we are persuaded that application of the statutory scheme (1) furthers the state's compelling interests in preserving the wildlife of the state and regulating its exploitation for the benefit of all citizens; (2) serves a special governmental need outside the ordinary law enforcement context; (3) requires only a slight intrusive impact consisting of interference sufficiently less invasive than an arrest; and that (4) the state's compelling and special objectives cannot be achieved through means significantly less restrictive of privacy freedoms.

B.
There can be no doubt that the state's interest in safeguarding the wildlife and fisheries for the benefit of the people is compelling. *1265 The paramount importance of these invaluable natural resources is recognized by our state constitution, property laws and regulatory statutes. The state constitution establishes a public trust doctrine requiring the state to protect, conserve and replenish all natural resources, including the wildlife and fish of the state, for the benefit of its people. La. Const.1974, Art. IX, §§ 1, 7; Matter of American Waste & Pollution Control Co., 588 So.2d 367 (La.1991); Save Ourselves, Inc. v. Louisiana Envtl. Control Comm'n, 452 So.2d 1152 (La.1984); Matter of Dravo Basic Materials Co., Inc., 604 So.2d 630, 634 (La.App. 1st Cir.1992); Sierra Club v. Louisiana Dep't of Wildlife & Fisheries, 519 So.2d 836 (La.App. 4th Cir.1988). See L. Hargrave, The Public Trust Doctrine: A Plea for Precision, 53 La.L.Rev. 1535 (1993); J. Wilkins and M. Wascom, The Public Trust Doctrine in Louisiana, 52 La.L.Rev. 861, 865 & 896-99 (1992); N. Absher, Note, Constitutional Law and the Environment: Save Ourselves, Inc. v. Louisiana Environmental Control Commission, 59 Tul.L.Rev. 1557 (1985). See also La. Const.1974, Art. VII, §§ 10-A (Louisiana Wildlife and Fisheries Conservation Fund) and 10.2 (Wetlands Wildlife and Fisheries Conservation Fund). These constitutional provisions establish a standard of protection which the legislature and all public trustees are required to vigorously enforce. Upon judicial review, a public trustee is duty bound to demonstrate that he has properly exercised his responsibility under the constitution and laws. La. Const.1974, Art. IX, §§ 1, 7; Matter of American Waste & Pollution Control Co., supra; Save Ourselves, Inc., supra; Matter of Dravo Basic Materials Co., Inc., supra; Sierra Club, supra. Under the property laws of the state, wildlife is owned by the state and not subject to private appropriation except when done under regulations that protect the general interest. La. C.C.art. 3413; La.R.S. 56:3; State v. Monteleone, 171 La. 437, 131 So. 291 (1930); Leger v. Louisiana Dep't of Wildlife & Fisheries, 306 So.2d 391 (La.App. 3d Cir.1975). See also Lacoste v. Department of Conservation of State of Louisiana, 263 U.S. 545, 44 S.Ct. 186, 68 L.Ed. 437 (1924). The state's regulatory laws limit and control the exploitation of wildlife by requiring licenses to take game and fish (La.R.S. 56:103, 56:301.1), providing for the fixing of seasons and limits (La.R.S. 56:115 (empowering statute); see also, e.g. La.R.S. 56:116-56:120), regulating methods of taking (see, e.g. La.R.S. 56:121, 56:121.1), providing for the licensing of commercial fishing vessels (La.R.S. 56:304), and establishing wildlife management areas, refuges, public hunting grounds and recreation areas (La.R.S. 56:109, 56:701-56:802), as well as numerous preserves (La.R.S. 56:701-56:803). See generally La.R.S. 56:1-56:803. In fact the defendants concede that the state has a compelling interest in preserving the wildlife and in regulating its exploitation.

C.
The state has a special governmental need outside the ordinary law enforcement context to have its wildlife law officers stop hunters during open season near game habitat, check for hunting licenses, inquire about game taken, and request to inspect game in field possession. In this capacity, the wildlife officers act not only as law enforcers but also as public trustees protecting, conserving and promoting replenishment of the wildlife of the state. La.R.S. 56:1. See also Save Ourselves, Inc., 452 So.2d at 1156-57; Hargrave, supra, 53 La.L.Rev. at 1551-52; Wilkins & Wascom, supra, 52 La.L.Rev. at 896-98; Absher, supra, 59 Tul.L.Rev. 1557. One of their trusteeship functions is to serve as front line gatherers of information necessary to the intelligent formulation and revision of laws, regulations and policies affecting and regulating seasons, limits, management areas, food chains and supplies, and other factors related to the protection of the wildlife. In acting as conservators of the wildlife in the condition of property of the state, which is not subject to private appropriation except when done in compliance with law, wildlife officials serve the state's special needs for seeking disgorgement, repossession and disposition of game unlawfully taken. In addition but related to the foregoing, wildlife officials have a duty, in promoting the replenishment of the game, to attempt to obtain from persons visiting the wildlife habitat, information pertaining to the appearance, *1266 quality, quantity, health and habits of animals taken or sighted.

D.
On its face, the statutory scheme authorizes a suspicionless stop involving only a very limited intrusion that falls far short of the kind of invasion associated with an arrest. In essence, the statutes require an individual to have a valid license in his possession while hunting wild game and to exhibit the license upon the demand of a wildlife agent. The agent is authorized and required to stop every person dealing with wildlife in his territory, to demand to see the individual's license and to confiscate illegally possessed licenses. The agent is not authorized to subject a person to a search or an arrest unless there is probable cause to believe that a violation has occurred.
In actual operation, the stop for license check and game inquiry involves an extra element of intrusiveness beyond that literally required by statute, in that the agent usually asks the hunter whether he has taken any game and, if so, whether he will allow it to be inspected. Nevertheless, in our opinion, the entire encounter, which involves only a few questions and a brief detention usually of no more than one or two minutes, is consistent with the agent's constitutional and statutory duties and still falls far short of being analogous to an arrest.
We recognize that our analysis of the intrusive effects of stops for hunting license checks and game inquiries also must take into account their cumulative impact upon the general right to privacy or right to be left alone and free from unjustified governmental interference. In doing so, we conclude that the overall degree of interference with the privacy of citizens in general is slight because it is far less intrusive than that involved in other forms of suspicionless stops.
First, the potential interference with the activities of legitimate hunters is minimal, and the impact on the larger non-hunting segment of the populace is almost nonexistent. Only persons apparently engaged in hunting activities in or near wildlife areas during open seasons will be subjected to suspicionless stops. There is no special need for suspicionless stops of persons apparently engaged in hunting wild animals out of season because that conduct naturally gives rise to reasonable suspicion or probable cause to believe that criminal activity is afoot.
Second, hunters entering game habitats during open seasons are not taken by surprise because they know or should know of their exposure to license and game checks. The regularized manner in which the stops are made, and their close geographical and temporal ties to hunting activities, is visible evidence, reassuring to law abiding hunters, that the stops are duly authorized and believed to serve the public interest. In fact, it is well known that, traditionally, the vast majority of hunters expect and cooperate with field checks in the interest of preserving the wildlife and their own sport. See Comment, A Comment on Louisiana Wildlife Agents and Probable Cause: Are Random Game Checks Constitutional?, 53 La.L.Rev. 525, 550 (La.1992); Note, Fishing for Evidence: The Expansive Warrantless Search Powers of Fish and Game Wardens, 13 Hastings Const. L.Q. 119, 137-38 (1985); Captain Irvin Dares, The Enforcement of Wildlife & Fisheries Regulations: What are They Trying to Achieve?, The Louisiana Game Warden, Fall 1993, at 27.
Third, in making stops for hunting license checks and game inquiries, the agents' discretion is more limited than that of police officers making suspicionless roving highway patrol stops, movable and unannounced sobriety checkpoint stops, or fixed checkpoint border patrol stops. The game agents are required to check every hunter pursuing game within their territories during open seasons. The fact that they may allow some hunters to go unchecked during peak periods due to lack of forces does not make their stops any more arbitrary than the checkpoint operations which suffer from similar imperfections. Unlike Border Patrol agents at fixed checkpoints, who refer motorists selectively to a secondary inspection area for further questioning, possibly on the basis of apparent national origin, see United States v. Martinez-Fuerte, 428 U.S. 543, 96 S.Ct. *1267 3074, 49 L.Ed.2d 1116 (1976); id., 428 U.S. at 567, 96 S.Ct. at 3087 (Brennan, J., dissenting), wildlife agents are not authorized to detain any hunter after the brief license check and game query except when reasonable suspicion or probable cause develops that a game violation has occurred. Moreover, a claim that a particular exercise of discretion in making suspicionless hunting license checks and game inquiries was unreasonable is subject to post-stop judicial review.

E.
In enacting and applying the statutes at issue here, the state has advanced its compelling interest in protecting, conserving and replenishing wildlife through the least restrictive means of achieving its ends. The goal of wildlife preservation could not be accomplished without an adequate level of enforcement of laws limiting and controlling the taking of wildlife. In order to attain a satisfactory level of enforcement, wildlife agents must be able to make suspicionless stops of hunters in or departing from game areas during open seasons for the limited purposes of license checks and game inquiries.
The game laws could not be carried out effectively under the less restrictive alternative urged by the defendants, viz., a rule that an agent could never stop a hunter except on reasonable suspicion or probable cause to believe that a violation had occurred. Because of the nature of the wildlife laws and the characteristics of Louisiana's wildlife environment, this rule would largely eliminate any deterrence to violations of the hunting license requirement and the game limit laws.
It is impossible for agents to tell whether a hunter is licensed without stopping him for a license check. Without the prospect of suspicionless license check stops, hunters would have little incentive to purchase and carry hunting licenses. Unlike an unlicensed motor vehicle operator who incurs a substantial risk of being found out as an unauthorized driver by getting a traffic ticket or becoming involved in an accident, an unlicensed hunter runs only a small risk if agents cannot make suspicionless stops to check licenses. Further, because a hunting license lacks the utility of a driver's license as a means of identity and credibility, a hunter does not have the same incentive as a driver to maintain a valid license.
An extremely important aspect of wildlife law enforcement involves the conservation of game by detecting and apprehending violators who take or possess game in excess of the limits legally permitted. Because the taking or possession of game per se is not illegal, however, an agent's observation of a hunter killing or carrying game usually does not give rise to reasonable suspicion or probable cause that there has been a violation. Unlike drugs or drunk drivers, dead ducks evince no telltale signs, smells or behavior plainly indicating criminal activity. Consequently, if agents were not entitled to make suspicionless stops of hunters for license checks and brief questioning, the enforcement of the game limit laws would be retrenched to an unacceptable level. For example, the stop in the present case was part of an effort primarily to detect and prevent "duck tripping". Only by suspicionless stops can wildlife officers gather and record in sufficient numbers, the data necessary to detect and prevent "duck tripping". It would be virtually impossible to carry out this duty were probable cause or reasonable suspicion needed before a wildlife officer could stop a hunter to make game inquiries.
Louisiana's unique geography exacerbates the formidable problems inherent in wildlife law enforcement. One fourth of our state over 5.3 million acresconsists of wetlands. This includes 40% of the nation's total coastal wetlands. Wildlife enforcement officers are thinly spread over vast unpopulated and isolated wilderness areas comprised of low-lying salt, brackish, and fresh marshes, literally thousands of swamps, bogs, sloughs, creeks, lakes, bays, coves, rivers, bayous, streams, and tidal passes. Both the land and the water bodies are to a large extent affected by the tides, hurricanes, storms, high winds and upstream flood waters. The demarcation between land and water in Louisiana's coastal wetlands is constantly fluctuating and often indistinct. Wilkins & Wascom, supra, 52 La. L.Rev. at 869. See also Oliver A. Houck, *1268 Land Loss in Coastal Louisiana: Causes, Consequences, and Remedies, 58 Tul.L.Rev. 3 (1983).
Because covert surveillance of hunting activities in the wetlands is extremely difficult, game agents seldom are able to identify observable acts of game-taking as unlawful. Agents' hardships in determining when a taking exceeds the limit is made more severe by hunters' freedom of movement which is not nearly as restricted as movement by land; in the wetlands the hunter is not physically confined to as narrow a range of specific routes, roadways or egresses. Further, the combination of estuarine systems and infrastructures of roads, canals, landings, slips, piers, harbors, ports and boat houses offers countless points of debarkation for unlawfully taken game. No reasonable claim can be made that permanent checkpoints would be practical on such labyrinthine waterways leading to a myriad of places suitable for discharging wildlife cargo. All of this, plus the availability of camps, house boats, swift vessels, refrigeration, insulation and electronic communications allow for rapid, versatile transportation of unlawfully taken game from habitat areas under circumstances that do not frequently give rise to objective, articulable facts providing reasonable cause for suspicion and Terry-type investigatory stops.
Our decision in this respect, is adequately based on the foregoing judicially noticed legislative facts used in interpreting law and deciding upon the constitutional validity, interpretation and application of the statutes. See Pugh, Force, Rault & Triche, Handbook on Louisiana Evidence Law 280, comment (b) (1993); 1 J. Weinstein & M. Berger, Weinstein's Evidence § 200[03] (1992); 2 McCormick on Evidence § 328, at 386 (4th ed. 1992). For an extended authoritative discussion of the distinction between adjudicative and legislative facts see 3 K. Davis, Administrative Law Treatise § 15.1 et seq. (1980). Therefore, the defendants' objection that the state "failed to produce evidence indicating that there exist no less intrusive means to accomplish its ends," does not have any significant bearing on the matter at hand.

F.
The suspicionless stop for a hunting license check and game query conducted pursuant to state statutes in the present case is distinguishable from the sobriety check point stops which this court declared unconstitutional in State v. Church, 538 So.2d 993 (La.1989) and State v. Parms, 523 So.2d 1293 (La.1988). In those cases the police stopped travelers at highway checkpoints in a traditional criminal law enforcement context pursuant to their regular law enforcement function. Therefore, the warrant clause of Article I, § 5 required that their actions be preconditioned by probable cause and a warrant or the existence of one of the few established exceptions to those requirements. Although the privacy right infringements in those cases were less intrusive than an arrest, they did not serve a special government need outside the traditional law enforcement context. Therefore, the general warrant clause rule could not be replaced by a balancing test under the reasonableness clause. Accordingly, this court concluded in Church and Parms that the police had violated the motorists' rights of privacy under Article I, § 5 of the state constitution because the seizures had been made without either probable cause or reasonable suspicion that the motorists had violated the law.
Furthermore, the Church and Parms checkpoint stops would not pass constitutional muster under the reasonableness clause balancing test even if it were to be applied to those cases. First, the potential cumulative impact of these kinds of highway checkpoints upon the privacy rights of the motoring public is limitless and severely intrusive or restrictive. In today's society, the automobile is the primary means of an individual's transportation and necessary to his or her participation in a broad range of activities, including family, social, occupational, recreational, civic, educational, religious, athletic, health and medical functions. As a consequence, the automobile has become a symbol of individual freedom associated with the recognized right of personal autonomy and mobility. *1269 Therefore, the state's operation of such checkpoints, which can be deployed to stop thousands of motorists at unlimited numbers of highway locations, creates a severely disruptive and intrusive impact on the right to privacy. Second, the state's operation of such checkpoints is clearly more intrusive or restrictive than other equally, if not more, effective means of DWI law enforcement. As this court recognized in Parms and Church, the effectiveness of such checkpoint stops is minimal and probably no more effectual than the less intrusive means of using roving police patrols acting upon reasonable suspicion. For the foregoing reasons, stops such as in the present case are distinguishable from highway sobriety check point stops as in Parms and Church.
Accordingly, we conclude that a wildlife officers' suspicionless stop of a hunter during open seasons in or immediately departing from a wildlife habitat area, for the purpose of a license check and game query does not contravene Article I, § 5 of the Louisiana constitution.

IV.
Nor, in our opinion, do the hunting license inspection and game inquiry stops violate the Fourth or Fourteenth Amendment.
A Fourth Amendment "seizure" occurs when a government agent makes an investigatory stop of a vehicle or vessel. Michigan v. Sitz, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990); Brower v. County of Inyo, 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989); Moresi v. State, Dept. of Wildlife and Fisheries, 567 So.2d 1081 (La.1990). The question thus becomes whether such seizures are "reasonable" under the Fourth Amendment. Michigan v. Sitz, 496 U.S. at 449, 110 S.Ct. at 2485. In most cases, the police must possess probable cause for a seizure to be judged reasonable. See Dunaway v. New York, 442 U.S. 200, 209, 99 S.Ct. 2248, 2255, 60 L.Ed.2d 824 (1979). Only when a seizure is "substantially less intrusive" than a typical arrest, is the general rule replaced by a balancing test. Id., 442 U.S. at 210, 99 S.Ct. at 2255; Michigan v. Sitz, 496 U.S. at 457, 110 S.Ct. at 2489 (Brennan, J. dissenting).
The Supreme Court concluded in Michigan v. Sitz, supra, that the suspicionless initial stop of a car at an unannounced, nighttime sobriety checkpoint, is sufficiently less intrusive than an arrest so that the reasonableness of the seizure may be judged, not by the presence of probable cause, but by balancing "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." Brown v. Texas, 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979). Applying this test, the court decided that the balance of the state's concededly important interest in preventing drunken driving, the extent to which the sobriety checkpoint system could reasonably be said to advance that interest, and the degree of intrusion upon individual motorists who are briefly stopped, weighs in favor of upholding the state program as being consistent with the Fourth Amendment. Michigan v. Sitz, 496 U.S. at 455, 110 S.Ct. at 2488.
Applying these precepts to the present case, we believe that the balancing, not the probable cause, test should be applied to reach the conclusion that the hunting license inspection and game query stop does not violate the Fourth Amendment. First, such a stop is even less intrusive than an unannounced, nighttime sobriety checkpoint stop and therefore so much less invasive than an arrest as to call for application of the balancing test. As Justice Stevens pointed out, at such a variable and movable sobriety checkpoint, a motorist has no advance notice of its location and no opportunity to avoid the search entirely, or to prepare for, and limit, the intrusion on her privacy. Id. 496 U.S. at 462, 110 S.Ct. at 2492 (Stevens, J. dissenting). On the other hand, hunters know or should know that if they appear with hunting gear on specified dates in certain wildlife habitat they are apt to have their licenses checked by uniformed wildlife agents. Fowlers and stalkers after the state's game can hardly be surprised when they are required to exhibit their licenses to do so. Therefore, a person can avoid the stop entirely by remaining aloof from wildlife habitat during hunting season, or he can prepare for and limit the intrusion by having a valid license *1270 handy. Further, a check for a hunting license, coupled with a question about game, is far more easily standardized and less personally invasive than a search for evidence of intoxication. Cf., Id., 496 U.S. at 465, 110 S.Ct. at 2493. The nighttime sobriety check involves unwanted facial scrutiny by the local police and sometimes the discomforting revelation of "one's secrets [that] are not the stuff of criminal prosecutions." Id.
Second, the balance of the state's interest in preserving the wildlife and regulating its exploitation, the extent to which the license check system can reasonably be said to advance that interest, and the degree of intrusion upon individual hunters who are briefly stopped, weighs in favor of the state's stop, check and question procedure. No one can seriously dispute the magnitude of the task of preserving and conserving the wildlife, or the state's special and compelling interest in regulating hunting through the strict enforcement of license and limit laws. Conversely, the measure of the intrusion on hunters stopped briefly for license and game checks in the field, or en route immediately therefrom, during hunting seasons, is slight. Because persons in pursuit of game must leave normal environs, isolating themselves temporarily from the rest of society, brief hunting license and game query stops in the wild do not intersect and intrude upon the daily lives of the general mass of citizenry nearly to the same extent as highway sobriety checkpoints. In assessing "the degree to which the seizure advances the public interest" we must bear in mind that this passage was not meant to transfer from "politically accountable officials" to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public concern. Michigan v. Sitz, 496 U.S. at 453, 110 S.Ct. at 2487. For purposes of Fourth Amendment analysis, the choice among such reasonable alternatives remains with the governmental officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of enforcement officers. Id. Consequently, because we have concluded that stops for checking hunting licenses and for game queries are the least intrusive means to effectively achieve the state's compelling interest under the more stringent requirements of our state constitution, it necessarily follows that such stops are a "reasonable" means of achieving the state's ends under the Fourth Amendment analysis. We therefore hold that state game agents' practice of stopping hunters in the field for license checks and game inquiries is consistent with the Fourth Amendment.

Summary and Decree
In summary, we hold that a game agent's stop of a hunter in or departing from a wildlife habitat in open season and detention of him for the limited purposes of a license check and requests for game information and inspection does not violate the state or federal constitution. Our holding today is limited to the type of stop described in this opinion. Any further detention must be based on consent, probable cause or reasonable suspicion.
The judgment of the court of appeal is accordingly reversed, the judgment of the trial court is reinstated, and the case is remanded to the trial court for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
MARCUS, J., concurs and assigns reasons.
LEMMON and SCHOTT, JJ., concur.
MARCUS, Justice (concurring).
I agree with the majority's conclusion that it was not a violation of the state or federal constitution for game agents to stop defendants briefly for the limited purpose of inspecting their hunting license and any game in their possession. However, I disagree with the statement in the majority opinion that sobriety checkpoint stops should not be analyzed under the same reasonableness clause balancing test as the majority adopts for game license checkpoints. In my view, and in the view of the United States Supreme Court, the state's interest in preventing drunken driving outweighs the intrusion upon an individual motorist who is briefly stopped at a checkpoint. Michigan, Dept. of State Police v. Sitz, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990). For these reasons, I would re-examine our holdings in *1271 State v. Church, 538 So.2d 993 (La.1989), and State v. Parms, 523 So.2d 1293 (La.1988), and hold sobriety checkpoints to be constitutional under both the state and federal constitutions.
NOTES
[*] Schott, J., Ad Hoc, sitting in place of Cole, J., retired.