764 So.2d 64 (2000)
STATE of Louisiana
v.
Leon JACKSON.
No. 00-KK-0015.
Supreme Court of Louisiana.
July 6, 2000.
Rehearing Denied August 31, 2000.
*65 Richard P. Ieyoub, Attorney General, Harry F. Connick, District Attorney, Sanem Ozdural, New Orleans, Counsel for Applicant.
Bruce Gerard Whittaker, New Orleans, Counsel for Respondent.
TRAYLOR, J.[*]
We granted a writ of certiorari to decide whether the use of checkpoints by the police to verify that vehicles contain proof of insurance deprives the vehicle's operator of his guarantee against unreasonable seizures under the federal and state constitutions. After reviewing the issue, we conclude that Article I, § 5 of the Louisiana Constitution does not prohibit use of checkpoints to "seize" an automobile and expressly overrule our prior holding in State v. Church, 538 So.2d 993 (La.1989). We find that checkpoints are a valid law enforcement tool when conducted pursuant to neutral guidelines that limit the discretion of the officer in the field. Accordingly, we vacate the judgment of the court of appeal and remand to the trial court for further proceedings.

FACTS AND PROCEDURAL HISTORY
On August 10, 1999, New Orleans Police Officer Richard LeBlanc arrested the defendant for a variety of traffic offenses and seized from his person a small plastic bag containing marijuana. LeBlanc and his partner, Officer Hajek, had been participating in an insurance checkpoint at the intersection of Earhart and Mistletoe. Traffic was backed up to the top of the Earhart overpass, causing some motorists to blow their car horns. The officers were busy checking every vehicle at the foot of the overpass for insurance when Officer LeBlanc observed a green 1992 Acura Legend attempting to back up in traffic to avoid the checkpoint.
Given the congestion, the vehicle's operator, defendant Leon Jackson, could not turn the car around, and opted instead to pull it over to the side of the road at the top of the bridge. The defendant then exited the vehicle and walked down to the foot of the bridge where LeBlanc greeted him and asked for his driver's license. When defendant told the officer he did not have a license, LeBlanc ran his name through the computer which revealed his license had been suspended. The officer issued defendant citations for impeding traffic, improper backing, reckless operation, driving under a suspended license, improper lane usage, no insurance, and no registration. During a pat-down search accompanying a full custodial arrest of the *66 defendant,[2] LeBlanc recovered a small green zip-lock bag that contained marijuana.
The defendant was charged with possession of marijuana in violation of La.Rev. Stat. 40:966(D)(1). At the hearing on defendant's motion to suppress the marijuana, LeBlanc and Hajek explained that at the insurance checkpoint, officers checked all traffic coming through Earhart to Jefferson Parish. The checkpoint was conducted at approximately 10 P.M. by narrowing three lanes of traffic down to one lane with a row of six officers checking vehicles for driver's license, registration and proof of insurance. Officer Hajek further stated that when the vehicle's operator produced proof of insurance, the motorist would be allowed to proceed.
Officer Hajek explained that the insurance checkpoints were put in place under Chief Pennington's orders after the New Orleans Police Department began towing vehicles that did not contain proof of insurance. The officers' captain directed them to participate in one insurance checkpoint a week, whenever they worked the Second District Task Force.
On October 15, 1999, the trial court granted defendant's Motion to Suppress.[3] In its judgment suppressing the evidence, the trial court relied on our decision in State v. Parms, 523 So.2d 1293 (La.1988), which not only invalidated a DWI checkpoint under the Fourth Amendment for lack of neutral criteria to govern the police performing the DWI stops, but also strongly questioned whether, in light of the "higher emphasis on individual freedom [placed by La. Const.1974, art. I, § 5] than that found in the federal constitution," checkpoints "could ever pass muster under the Louisiana Constitution." Parms, 523 So.2d at 1303. Finding that the insurance checkpoint in the present case similarly lacked neutral criteria for stopping motorists and opining that the DWI checkpoint "served a far more compelling state interest" than did the insurance checkpoint, the trial court found that the checkpoint violated defendant's constitutional protections against unreasonable seizures.
The State sought review at the Fourth Circuit, which granted writs. State v. Jackson, No. 99-K-2749 (La.App. 4 Cir. 12/9/99). The State argued that, because of their administrative nature, insurance checkpoints should be treated differently than the DWI checkpoints roundly criticized by this court in Parms. The court of appeal acknowledged that this court has distinguished insurance checkpoints from DWI checkpoints, citing to State v. McHugh, 92-1852 (La.1/6/94), 630 So.2d 1259, and Fields v. State, 98-0611 (La.7/8/98), 714 So.2d 1244. Nonetheless, the appellate court affirmed, holding that the State violated defendant's constitutional rights under Parms and Church because it failed to establish that the checkpoint complied with objective standards and neutral criteria.
Subsequently, this court granted the State's writ. State v. Jackson, 00-0015 (La.2/25/00), 755 So.2d 244.

ANALYSIS

Constitutionality of Checkpoints under Federal Law
The Constitution of the United States guarantees "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. Amend. IV. The Fourth Amendment is enforceable against the states through the Fourteenth Amendment. Mapp v. Ohio, *67 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).
Although a police officer must normally have probable cause to effectuate a reasonable seizure, exceptions to this requirement have evolved. The United States Supreme Court has approved an exception for search and seizure by a governmental authority where the officer has no articulable suspicion of wrongdoing in the context of border checkpoints to reduce the flow of illegal immigrants, United States v. Martinez-Fuerte, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); checkpoints to verify driver's licenses, Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); and checkpoints to determine sobriety, Michigan Dep't of State Police v. Sitz, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990).
In Delaware v. Prouse, the reasonableness of the seizure was determined by "balancing [the] intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." 440 U.S. at 654, 99 S.Ct. 1391. Random automobile inspections conducted without articulable and reasonable suspicion that a motorist is in violation of a traffic regulation are prohibited unless there are previously specified "neutral criteria" which prevent the unfettered exercise of discretion by a police officer in the field. Id. at 662, 99 S.Ct. 1391. Notably, however, the Supreme Court suggested the "[q]uestioning of all on-coming traffic at roadblock-type stops" as a presumably constitutional alternative. Id. at 663, 99 S.Ct. 1391.
In Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), the Court proposed a balancing test to evaluate the constitutionality of seizures made without articulable suspicion of wrongdoing that weighs "the gravity of public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." 443 U.S. at 50-51, 99 S.Ct. 2637. Above all, such a seizure must be conducted under a plan "embodying explicit, neutral limitations on the conduct of individual officers." Id.
Subsequently, in Michigan Dep't of State Police v. Sitz, the Supreme Court upheld the use of a sobriety checkpoint. In doing so, the Supreme Court clarified the application of the balancing test enunciated in Brown. To measure the effectiveness of the seizure for "advancing the public interest," the Court noted that:

Brown was not meant to transfer from politically accountable officials to the courts the decision as to which reasonable alternative law enforcement techniques should be employed to deal with a serious public danger.... [F]or purposes of Fourth Amendment analysis, the choice among reasonable alternatives remains with the governmental officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers.
496 U.S. at 453-54, 110 S.Ct. 2481. While a complete absence of empirical data may be constitutionally unacceptable, the Supreme Court disproved the searching empirical analysis done by the Michigan court that found a sobriety checkpoint ineffective when only 1.6% of the drivers passing through were found alcohol impaired. Id. at 454-55, 110 S.Ct. 2481.
In evaluating the "subjective intrusion" to the stopped motorist, the Court clarified that the potential for generating "fear and surprise" must be considered from the standpoint of the law-abiding citizen, not the fear of one who has been drinking. Id. at 452, 110 S.Ct. 2481. Finding the checkpoint to be a reasonable seizure, the Court noted the very brief detention that occurred to each motorist passing through the checkpoint and that the officers followed detailed guidelines which limited their discretion. Id. at 447, 110 S.Ct. 2481.
Under federal law, checkpoints such as the instant one presumably do not violate constitutional guarantees under the *68 Fourth Amendment. See United States v. Galindo-Gonzales, 142 F.3d 1217, 1221 (10th Cir.1998) (holding that "a brief stop at a highway roadblock for the limited purpose of verifying a driver's license, registration, and proof of insurance is a reasonable intrusion into the lives of drivers and their passengers even in the absence of reasonable suspicion that an individual passenger or motorist is engaged in illegal activity."); United States v. McFayden, 865 F.2d 1306, 1313 (D.C.Cir.1989) (stressing checkpoint involved stopping "all the cars passing in either direction"); see also United States v. Corral, 823 F.2d 1389 (10th Cir.1987); United States v. Obregon, 748 F.2d 1371 (10th Cir.1984).[4]

Checkpoints under Prior Louisiana Cases
The Louisiana Constitution echoes the Fourth Amendment's mandate and provides, "every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures or invasions of privacy." La. Const. art. I, § 5. This court has considered the constitutionality of checkpoints to check for drunken motorists in State v. Parms, 523 So.2d 1293 (La.1988), and State v. Church, 538 So.2d 993 (La.1989); and to investigate game limit violations in State v. McHugh, 92-1852 (La.1/6/94), 630 So.2d 1259.
In Parms, this court concluded that the particular DWI checkpoint under consideration failed to pass muster under the federal constitution.[5] Although the officers had stopped every car at the checkpoint unless they were all occupied with other vehicles, the record in Parms contained no evidence that: (1) police administrative officials had previously adopted guidelines governing the operation of the checkpoint; (2) the checkpoint had been established at a spot likely to snare drunken drivers; (3) the particular checkpoint in fact had significant success (the officers kept no statistics on how many cars were stopped compared to the number of DWI arrests); or (4) the checkpoints were generally more effective than random suspicion-and-violation based stops. 523 So.2d at 1302-03.
On the other hand, some evidence did indicate that the police had set up the checkpoint to keep the officers "busy" for the night. Id. at 1302. Significantly, we observed that "the officers were also checking driver's licenses, proof of insurance and inspection stickers." Id. at 1294. In fact, the defendant in Parms had not been driving erratically when he was stopped at the checkpoint and asked for his driver's license. It was only after the officer detected the strong order of alcohol and ordered Parms to pull over to the shoulder of the road, that it immediately became obvious once he got out of his vehicle that the defendant was highly intoxicated. Id. at 1295. Although the stop in Parms began with a regulatory inspection, we characterized the police operation as a DWI checkpoint because the officers admitted that the "real purpose of the roadblock was a sobriety check." Id. at 1295.
In Church, this court held that while DWI checkpoints conducted according to *69 neutral criteria[6] may pass muster at the federal level, Article I, § 5 of the Louisiana Constitution affords broader protection to our citizens than the Fourth Amendment of the U.S. Constitution. In Church, the state stipulated that the defendant was not observed committing any violation and was stopped solely because of the checkpoint. 538 So.2d at 995. We concluded that the state could not justify intruding on the defendant's right to be left alone when the record indicated the checkpoints did not prove very effective, yielding an average of 1.5 DWI arrests for every 100 cars stopped. Id. at 997. As in Parms, the stops in Church began with a driver's license check and developed into more extended detentions if the officers detected signs of intoxication. 538 So.2d at 994. Also as in Parms, the officers in Church characterized their stop location as a DWI checkpoint. Id.
In contrast, in McHugh, this court held that wildlife agents could conduct random and suspicionless stops of hunters departing from a wildlife habitat in open season and detain them for the limited purpose of checking licenses and requesting pertinent game information without violating either the state or federal constitutions. To justify the seizure under the Louisiana Constitution, the McHugh court crafted a specialized test that required: (1) a compelling state interest; (2) special governmental needs outside the ordinary law enforcement context; (3) a stop less invasive than an arrest; and (4) no less restrictive means available to monitor violations. McHugh, 630 So.2d at 1264. Under that test, we reasoned that the state's interest in preserving and managing its wildlife preserves was compelling and not easily accomplished by any other means, and that the intrusion on the individual's freedom was comparatively minimal and easily controllable, i.e., individuals could avoid the stops by not hunting at all. Id. at 1269.
McHugh distinguished Church and Parms on the basis that DWI stops involve traditional law enforcement functions, intrude on the driver's privacy significantly, and succeed only minimally in ferreting out drunken drivers. Id. at 1268. By contrast, license and game checks form part of an intricate regulatory scheme protecting the vital resources of the state, have only incidental law enforcement consequences, and intrude on hunters' privacy expectations only minimally. Id. at 1270.
Initially, we find that the distinctions made in Parms and Church in the context of automobile checkpoints, and McHugh for hunting license checkpoints, create the anomaly that preservation of the state's wildlife is a more compelling governmental interest than the protection of human life from drunken drivers on our public roadways. We reject the reasoning of these cases and refuse to further a fractured approach to constitutional analysis for the reasons discussed below.
The State argues that insurance checkpoints are valid administrative violations checkpoints that are statutorily authorized by the legislature and thus more closely resemble the hunting license checkpoints in McHugh. Under Louisiana law, every vehicle registered in the state must be covered by an automobile liability insurance policy within specified liability limits. La.Rev.Stat. 32:861(A)(1). To ensure compliance, the statutory scheme requires that proof of liability insurance be carried in the vehicle at all times. See La.Rev.Stat. 32:863.1(A). To enforce this requirement, La.Rev.Stat. 32:863.1(B) provides:

*70 When a law enforcement officer stops a vehicle at an administrative violations checkpoint, ... the law enforcement officer shall determine if the owner or lessee of each vehicle is in compliance with the provisions of this Section which require evidence of liability insurance or other security to be contained in the vehicle. If the owner or lessee is not in compliance with those provisions, the law enforcement officer shall take the actions specified in this Section.
We note that the privacy compromised at DWI stops, at which drivers would presumably be required to demonstrate their sobriety in some manner, appears greater than that involved at the insurance checkpoints. On the other hand, given the standard use of automobiles as a means of transportation, the stops appear far less avoidable than the hunting license stops conducted by wildlife agents in McHugh.
More importantly, we acknowledge that insurance checkpoints further an administrative goal and do not involve traditional law enforcement functions as do DWI checkpoints, and therefore would be distinguishable on that basis under our reasoning in McHugh. However, it becomes impossible as a practical matter to distinguish one kind of checkpoint from another under the Louisiana Constitution because checkpoints of this nature can serve multiple purposes.[7] The stops in Parms and Church began with "regulatory" checks for driver's licenses and insurance, but were nevertheless characterized as DWI checkpoints because that is how the officers described their operations.
After careful consideration, we decline to draw a distinction that makes the result in a given case depend on how police characterize the checkpoint. If the defendant in the present case had staggered on foot down the Earhart overpass in an obviously intoxicated condition and had been arrested for DWI in addition to his other traffic offenses, this case would be another Parms or Church, but for the fact that the police labeled the stop an insurance checkpoint. In both situations, the police would have observed behavior that gave them reasonable suspicion to suspect a DWI violation while stopping motorists to check for regulatory violations. While checkpoints of this nature presumably involve merely providing a law enforcement agent with proof of insurance and therefore appear less intrusive than the DWI checkpoints which requires the vehicle's operator to demonstrate his sobriety in some manner, Parms and Church reflect how easily one may evolve into the other.[8] We conclude that a consistent approach to checkpoints, regardless of which laws they are designed to enforce, can be implemented that withstands scrutiny under the Louisiana Constitution.

Checkpoints under the Louisiana Constitution
Our decision in Church was premised on the contention that Article 1, § 5 of the Louisiana Constitution of 1974 places greater restrictions on law enforcement *71 personnel than does amendment IV of the United States Constitution.[9] We have recognized that the Louisiana Constitution provides greater protection for individual rights than that provided by the Fourth Amendment in some circumstances.[10] However, we find no discernable difference between the two constitutional provisions as applies to this particular situation, namely automobile checkpoints.[11]
Presumably neither did the drafters of Article 1, § 5, at the Louisiana Constitutional Convention of 1973.[12] The discussion demonstrates an intent to parallel the U.S. Supreme Court's decisions regarding individual liberty under the federal constitution. The thrust of the delegate discussion was relating its purpose to that of the U.S. constitutional provision, as interpreted by the United States Supreme Court.[13]
The distinctive textual difference between the Louisiana Constitution's article I, § 5, and the Fourth Amendment consists of the phrase "invasions of privacy." As pointed out by Lee Hargrave in The Declaration of Rights of the Louisiana Constitution of 1974, 35 La. L.Rev. 1, 20 (1974), the provision dealing with invasion of privacy is an expansion of the traditional guarantee against unreasonable searches and seizures.[14] The phrase's roots can be traced to "the reference of an expanded federal right to privacy in Griswold v. Connecticut[ 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965)] and to fears of unrestrained gathering and dissemination of information on individuals through use of computer data banks." LEE HARGRAVE, THE LOUISIANA STATE CONSTITUTION 29 (1974).
In light of the drafters' apparent intent, the individual is already protected against unreasonable seizures by the federal constitution and its parallel in the Louisiana Constitution. The protection against unreasonable "invasions of privacy" adds no additional barrier between the motorist and traditional law enforcement functions and does not, in itself, automatically preclude the state's use of checkpoints.
Rather, the question becomes a balancing test for reasonableness under the Louisiana Constitution: the weighing *72 of the state's legitimate interest advanced against the privacy right infringed by the practice. The slight inconvenience of a properly conducted checkpoint does not violate our standard of liberty as protected under Article I, § 5. In reestablishing our adherence to the balancing test enunciated in Prouse and its progeny, we expressly overrule Church's holding that the Article I, § 5 privacy clause prohibits the use of automobile checkpoints to further a valid government interest, no matter how compelling.
In his supplemental brief, the defendant argues that the authority to set up checkpoints returns Louisiana to "the tyranny of a police state." We disagree. Driving is a privilege, not a right, and as such, it is subject to reasonable regulation. Fields, 714 So.2d at 1254. The State has a legitimate interest in verifying regulatory compliance without waiting for a driver to commit a traffic violation or suffer an accident. In the latter instance, the damage caused by lack of insurance has already been done.
The scope of our state constitution does not preclude all forms of governmental interference nor does it mandate that governmental interests can never interfere with individual privacy expectations. Where the state interest is legitimate, and that interest is exercised through checkpoints pursuant to carefully designed guidelines which afford a minimum interference with individual rights, that checkpoint will be deemed permissible under the Louisiana Constitution.

Neutral Guidelines For Checkpoints
A checkpoint constitutes a seizure under the Fourth Amendment. Sitz, 496 U.S. at 450, 110 S.Ct. 2481. Checkpoints have been held permissible under the federal constitution and several state constitutions.[15] In all cases addressing the constitutionality of the checkpoints, the intrusion on the individual's liberty interest has been weighed against the legitimate governmental interest involved. Whether or not the governmental interest outweighs the concern for the protection of the individual's reasonable expectation of privacy is determined in part by the severity of the intrusion inflicted by the state in a given set of circumstances. Other jurisdictions considering the issue have developed a list of factors to assist in making this determination.[16]
After review of these cases, we set forth the following guidelines for evaluating whether the checkpoint's intrusiveness will withstand constitutional muster under the Fourth Amendment and Louisiana's Article I, § 5:[17]
(1) the location, time and duration of a checkpoint, and other regulations for operation of the checkpoint, preferably in written form, established by supervisory or other administrative personnel rather than the field officers implementing the checkpoint;
(2) advance warning to the approaching motorist with signs, flares and other indications *73 to warn of the impending stop in a safe manner and to provide notice of its official nature as a police checkpoint;
(3) detention of the motorist for a minimal length of time; and
(4) use of a systematic nonrandom criteria for stopping motorists.
In evaluating a checkpoint under this test, the guiding principle must be that the procedures utilized curtail the unbridled discretion of the officer in the field. Prouse, 440 U.S. at 662, 99 S.Ct. 1391; Brown, 443 U.S. at 51, 99 S.Ct. 2637.
Applying the guidelines to this case, we conclude that the record is inadequate to address whether the insurance checkpoint implemented by Officers Hajek and Le-Blanc was constitutionally acceptable. The officers testified that every vehicle was stopped, and that the checkpoint was conducted pursuant to a task force assignment under Chief Pennington's orders. However, the record lacks sufficient evidence of the regulations or guidelines used for selecting and implementing the checkpoint, the length of time each motorist was detained, and the indicia to approaching motorists of the checkpoint's official nature. Considering that the State did not have the above guidelines when it brought charges against the defendant, fairness dictates that the State be given the opportunity to establish the evidence.

CONCLUSION
The Louisiana Constitution does not prohibit the use of checkpoints as a valid law enforcement tool when conducted pursuant to neutral guidelines limiting the discretion of the field officer. The state has a legitimate interest in deterring drivers from taking to the roads without insurance in its role of ensuring the safety of our public roadways. However, we remand the case to the trial court for a hearing to establish whether the insurance checkpoint meets the constitutional requirements using a reasonableness balancing test that considers the above factors.

DECREE
Accordingly, we vacate the Fourth Circuit Court of Appeal and the trial court granting defendant's motion to suppress. The case is remanded to the trial court for further proceedings consistent with this opinion.
VACATED AND REMANDED.
CALOGERO, C.J., concurs in part, dissents in part and assigns reasons.
JOHNSON, J., concurs in the remand to allow the state to establish a neutral criteria.
CALOGERO, C.J., concurring in part and dissenting in part.
The case which the majority reverses, State v. Church, drew three (3) dissents as well as a concurrence by this writer. My decision to concur in Church was premised on my belief at the time that the roadblock at issue was impermissible under the United States Constitution and the Louisiana Constitution of 1974. However, just one year after Church, in 1990, the United States Supreme Court decided Michigan Department of State Police v. Sitz, 496 U.S. 444, 110 L.Ed.2d 412, 110 S.Ct. 2481 (1990), which determined that a sobriety roadblock, such as the one in Church, was permissible under the United States Constitution.
The convincing resolution at the federal level following Church resolves the federal constitutional issue favorably to the State in this case. Accordingly, I join in the majority's conclusion that the roadblock in this case is permissible under the Fourth Amendment to the United States Constitution.
However, the majority's overruling of Church and its conclusion that the roadblock at issue in this case does not violate the Louisiana Constitution prompts me to dissent in part. I would maintain this Court's resolution under the state constitution reached in our 1989 Church decision, *74 which held that DWI roadblocks, where motorists are "seized" without reasonable suspicion or probable cause, are impermissible under the Louisiana Constitution of 1974.
NOTES
[*] Kimball, J. not on panel. Rule IV, Part 2, § 3.
[2] The arrest was necessitated by the defendant's lack of a valid operator's license to deposit in lieu of security. See La.Rev.Stat. 32:391(A); La.Rev.Stat. 32:411(A); see United States v. Kye Soo Lee, 962 F.2d 430, 436-37 (5th Cir.1992).
[3] The court tried the motion to suppress and the trial on the merits simultaneously. However, the court granted the defendant's motion at the close of the State's evidence.
[4] State courts interpreting the Fourth Amendment have also upheld checkpoints similar to the one used here. See State v. Davis, 195 W.Va. 79, 464 S.E.2d 598, 601 (1995) (stressing that "every vehicle approaching the roadblock was stopped"); State v. Cloukey, 486 A.2d 143 (Me.1985) (holding that a checkpoint need not be approved by supervisory personnel); State v. Baldwin, 124 N.H. 770, 475 A.2d 522 (1984); Miller v. State, 373 So.2d 1004 (Miss.1979) (upholding checkpoint that checked licenses of everyone driving as authorized under Prouse).
[5] Although this court in Parms discussed the checkpoint as a violation of the Louisiana Constitution, the holding was unnecessary for the result in the case and as such constituted dicta. We reserved for another day the question of "whether other DWI roadblocks, conducted under guidelines approved in other jurisdictions, are violative of the Louisiana Constitution." See Parms, 523 So.2d at 1305 (on rehearing); Church, 538 So.2d at 997.
[6] The neutral criteria used by the Shreveport police in Church included:(1) a written plan for checkpoint implementation, approved by supervisory personnel; (2) advance notice to the media in radio broadcasts and newspaper reports; (3) checkpoint locations chosen in areas high in alcohol-related accidents and arrests; (4) every vehicle stopping at the checkpoint; (5) warning and safety of the impending checkpoint provided by extensive use of flares and red lights on the top of numerous patrol cars; and (6) adequate law enforcement personnel to minimize detention time for each motorist. State v. Church, 530 So.2d 1235, 1237-38 (La.App. 2d Cir.1988), overruled by, 538 So.2d 993 (La.1989).
[7] We note that other jurisdictions have either banned the use of multipurpose "dragnet" stops, see Webb v. State, 739 S.W.2d 802, 812 (Tex.Crim.App.1987), or required a finding of probable cause, such as a traffic violation as occurred in this case, to justify a further intrusion for investigatory activity other than that specified for the checkpoint, see State v. Flowers, 328 N.J.Super. 205, 745 A.2d 553 (App.Div.2000). However, we agree with the Illinois Supreme Court which stated:

The official subterfuge with respect to the true purpose of the roadblock is not entitled to much weight in the balancing process.
The subjective reaction of drivers stopped at the roadblock would not have been substantially different had the participating officers been instructed that the primary purpose of the stop was to check on drunken drivers rather than on license violations.
State v. Bartley, 109 Ill.2d 273, 93 Ill.Dec. 347, 486 N.E.2d 880, 888 (1985).
[8] It was almost certainly for this reason that Parms observed in the broadest possible terms that "it is doubtful if [checkpoints] could ever pass muster under the Louisiana Constitution." 523 So.2d at 1303.
[9] Despite the contention that Church stands for interpretation of the Louisiana Constitution beyond the U.S. Supreme Court's jurisprudence on the Fourth Amendment, it is interesting to note that much of Church's reasoning regarding the effectiveness of the checkpoint presumably was based on the second prong of Brown's balancing test. Significantly, the Church rationale that a 1.5% result for DWI drivers was ineffective has been repudiated by the U.S. Supreme Court in the Sitz decision. 496 U.S. at 454, 110 S.Ct. 2481.
[10] This court has stated: "This constitutional declaration of right is not a duplicate of the Fourth Amendment or merely coextensive with it; it is one of the most conspicuous instances in which our citizens have chosen a higher standard of individual liberty than that afforded by the jurisprudence interpreting the federal constitution." State v. Hernandez, 410 So.2d 1381 (La.1982).
[11] Despite our recognition that Article I, § 5 provides broader rights in some circumstances, see, e.g., State v. Perry, 610 So.2d 746, 756 (La.1992), we have also held that traditional search and seizure analysis under the Fourth Amendment, as interpreted by the U.S. Supreme Court, is applicable under Article I, § 5 in certain circumstances, see, e.g., State v. Tucker, 626 So.2d 707, 711 & n. 6 (La.1993). In particular, we have previously adopted the United States Supreme Court's interpretation for searches of automobiles without a warrant. See State v. Tatum, 466 So.2d 29 (La.1985); State v. Chaney, 423 So.2d 1092 (La.1983).
[12] See Church, 538 So.2d at 1000 (Cole, J. dissenting) (citing the transcript of The Louisiana Constitutional Convention of 1973, Vol. XIII, at 15-17).
[13] See Lee Hargrave, The Declaration of Rights of the Louisiana Constitution of 1974, 35 La. L.Rev. 1, 22 & n. 102 (1974).
[14] See also John Devlin, Louisiana Constitutional Law, 51 La. L.Rev. 295 (1990) (labeling the three types of privacy rights as "search and seizure," "disclosural," and "autonomy" rights, and proposing that the invasion of privacy clause was meant to expand protection in the latter two categories.)
[15] See Ingersoll v. Palmer, 43 Cal.3d 1321, 241 Cal.Rptr. 42, 743 P.2d 1299 (1987); Nelson v. Lane County, 304 Or. 97, 743 P.2d 692 (1987); State v. Garcia, 500 N.E.2d 158 (Ind.), cert. denied, 481 U.S. 1014, 107 S.Ct. 1889, 95 L.Ed.2d 496 (1987); Little v. State, 300 Md. 485, 479 A.2d 903 (1984); State v. Deskins, 234 Kan. 529, 673 P.2d 1174 (1983); see generally Theresa Kruk, Annotation, Validity of Routine Roadblocks by State or Local Police for Purpose of Discovery of Vehicular or Driving Violations, 37 A.L.R. 4th 10 (1985 & Supp.2000).
[16] See LaFontaine v. State, 269 Ga. 251, 497 S.E.2d 367 (1998) (five factors); Las Cruces v. Betancourt, 105 N.M. 655, 735 P.2d 1161 (App.), cert. denied, 105 N.M. 618, 735 P.2d 535 (1987) (eight factors); Little, 479 A.2d at 903 (four factors); Deskins, 673 P.2d at 1174 (twelve factors).
[17] Although we traditionally are reluctant to invoke our supervisory authority to adopt guidelines that govern police conduct, we note the need to provide guidance on establishing checkpoints in our reversal of Church, and the lack of legislative guidelines for implementing checkpoints.