917 So.2d 1262 (2005)
STATE of Louisiana, Appellee
v.
Thomas James KNOWLES, Appellant.
Nos. 40,324-KW, 40,325-KW.
Court of Appeal of Louisiana, Second Circuit.
December 30, 2005.
*1263 Whitley R. Graves, Benton, for Appellant.
J. Schuyler Marvin, District Attorney, Dale N. Montgomery, John M. Lawrence, Assistant District Attorneys, for Appellee.
Before GASKINS, MOORE and LOLLEY, JJ.
MOORE, J.
A Louisiana Wildlife and Fisheries Enforcement agent stopped an SUV driving *1264 through the Bodcau Wildlife Management Area ("WMA") to determine if the occupants had obtained a permit to conduct activities in the WMA. The stop led to further investigation in which the agent learned that marijuana was in the vehicle. The agent told the sleeping passenger to get out of the vehicle. Once out of the vehicle, the passenger attempted to flee the scene. The agent chased and apprehended him. He was arrested and charged with possession of marijuana, possession of drug paraphernalia, resisting an officer, and violating the rules and regulations of the WMA.
Defendant filed a motion to suppress alleging that the evidence was obtained as a result of an unconstitutional stop. The motion was denied and the defendant was subsequently convicted of possession of marijuana and resisting an officer. He filed this appeal.
For the following reasons, we vacate and set aside defendant's convictions and sentences, and remand the case to the trial court for further proceedings. The judgment denying the motion to suppress is reversed.

Facts
Around 8:30 PM on July 22, 2004, the defendant, Thomas Knowles, was a passenger in a vehicle driven by Justin Holt. Knowles was sleeping as they drove on Tram Road in the Bodcau WMA located in Bossier Parish. Tram Road is the main road through Bodcau WMA that connects the community of Bellevue with Ivan, Louisiana.
Senior Agent Jason Clinton of the Louisiana Department of Wildlife and Fisheries Enforcement Division was parked in his truck on the side of Tram Road doing paperwork when he saw Holt's vehicle approaching and slowing down. He got out of his truck and flagged the vehicle down to a stop. Agent Clinton testified that the sole reason he stopped the vehicle was to determine if the occupants had obtained a self-clearing check-in permit at the entrance of the Bodcau WMA. He had seen no violations of the law. Agent Clinton testified that entrants to the WMA were required to check in at one of the entrances to the WMA. Entrants who check in fill out a self-clearing form and obtain a tag consisting of the lower portion of an information card in which the entrant writes his or her name and address and the reason for being in the WMA, such as camping, sight-seeing, bird-watching, etc. This upper part of the card is separated from the lower part and put in a box at the station; regulations require that the lower portion of the card be displayed on the vehicle only if the occupants park and leave the vehicle.
After stopping Holt's vehicle, Agent Clinton approached the driver's side of the vehicle and asked Holt if he had checked in. Holt said that he had not. Agent Clinton said that he detected the odor of marijuana at this time, and he asked Holt if they had any kind of narcotics or illegal substance in the vehicle. He said that Holt stated that "there were two blunts which were in plain view in the ashtray." Agent Clinton also found a clear plastic bag of marijuana on the passenger floorboard.
Agent Clinton saw the defendant asleep in the vehicle. He was not engaged in any criminal activity. Agent Clinton said he obtained consent to search the vehicle from Holt and ordered the defendant to get out of the vehicle. Agent Clinton testified that he planned to perform a protective pat-down of the defendant. He told the defendant to take his hands out of his pockets when he observed the defendant take a small plastic bag from his pocket, place it in his mouth, and take off running. He said that he had not placed *1265 the defendant under arrest at this time. He chased the defendant about 100 yards before catching him. At this time he handcuffed him and placed him under arrest. He issued the defendant citations for possession of marijuana, possession of drug paraphernalia (the paper used to wrap the marijuana blunts), resisting an officer, and not abiding by the rules and regulations of the WMA.

Procedural History
On August 26, 2004, the assistant district attorney filed four bills of information against Knowles charging him with possession of marijuana in violation of La. R.S. 40:966 C & D, punishable by a fine of not more than $500 or imprisonment for not more than six months, or both; possession with intent to use drug paraphernalia in violation of La. R.S. 40:1033, punishable by a fine of not more than $500 or imprisonment for not more than six months, or both; resisting an officer, a violation of La. R.S. 14:108, but erroneously cited in the bill as a violation of La. R.S. 14:108.1, which is "flight from an officer," the latter punishable by a fine of not less than $150 nor more than $500, or imprisonment for not more than six months, or both. (The court adopted the charge of resisting an officer, a violation of 14:108, punishable by a fine of not more than $500, or imprisonment for not more than six months, or both); and not abiding by the rules and regulations of a WMA in violation of La. R.S. 56:109 B.
The defendant filed a motion to suppress on December 13, 2004. The court held a hearing on the motion on July 25, 2005 establishing the facts as we set out above. The court denied the defendant's motion, holding that Section 111G.1. of Title 76, Part XIX of the Louisiana Administrative Code cautions citizens entering a WMA managed by the Louisiana Department of Wildlife and Fisheries that they may subject themselves and/or their vehicles to game and/or license checks, inspections and searches. The court noted that Agent Clinton testified that he normally stops vehicles in the Bodcau WMA to check them for the permit. The court concluded that Agent Clinton was engaged in the lawful performance of his duties when he stopped the vehicle, and his actions were based on his good faith perception of what he was authorized by law to do, and therefore not a subterfuge to conduct random stops in search of possible illegal activity.
Trial was held on April 29, 2005. At that time, the state declined to file the bill of information alleging violations of the WMA regulations, but proceeded to prosecute the other charges for possession of marijuana and drug paraphernalia and flight from an officer.
After the evidence was adduced, the trial court rejected the possession of drug paraphernalia charge, which was based solely on the paper in which the two marijuana blunts were wrapped or the plastic bag. The court found the defendant guilty of possession of marijuana. The court noted that the charge of resisting an officer was incorrectly filed as a violation of the offense of flight from an officer under La. R.S. 14:108.1, which requires that the offender be operating a motor vehicle when the offense occurs. Although the state did not seek to amend the charge, the court concluded that the incorrect statutory citation was inadvertent and found the defendant guilty of resisting an officer under La. R.S. 14:108.
On the possession of marijuana conviction, defendant was sentenced to 60 days in jail, suspended, subject to one year active, supervised probation, and various special conditions. On the charge of resisting an officer, the defendant was ordered to pay a fine of $100 plus court costs or serve 10 days in jail. This fine was in *1266 addition to (consecutive to) the possession of marijuana fine; however, the court costs assessment was made concurrent.
Defendant applied for a supervisory writ of review. By order dated June 16, 2005, we noted that the state had failed to file the several misdemeanor charges under a single bill of information under La. C. Cr. P. art. 493.1 limiting the sentence to six months; however, the record showed that the trial court, defense attorney and assistant district attorney agreed to a limitation on sentencing on any offenses of conviction to a penalty that would not exceed that which would invoke the right to a jury trial, and based on that stipulation, we concluded that the defense waived a jury trial. Nevertheless, because the cases were triable by jury, they were appealable. See La. Const. art. 1, § 17 and La. Const. art. 5, § 10(A)(3). Accordingly, we remanded the case to the district court to prepare the record for appeal. This appeal followed.

Discussion
By his first assignment of error, defendant contends that the trial court erred in denying his motion to suppress, alleging that the "random roadblock situation" created by Agent Clinton does not comply with the requirements of State v. Jackson, XXXX-XXXX (La.7/6/00), 764 So.2d 64. Nor, argues defendant, did the investigatory stop meet an approved exception for a random search and seizure or an investigatory stop by a governmental authority where the officer has no articulable suspicion of wrongdoing.
The state, on the other hand, argues that Agent Clinton had the regulatory authority to make an "investigatory stop" to determine if the occupants of the vehicle had obtained a "check-in" permit required by WMA regulations, noting that this authority was recognized in State v. McHugh, 92-1852 (La.1/6/94), 630 So.2d 1259. In McHugh, the Louisiana Supreme Court held that it was not an unreasonable search, seizure or invasion of privacy under the federal and state constitutions for game agents to stop hunters for the limited purpose of demanding that they exhibit their hunting licenses, inquire if they have any game, and request to inspect the game in their possession, where the hunters were exiting a wildlife area during hunting season under circumstances clearly indicating that they had been hunting and possibly had game in their possession. Id. at 1261.
After reviewing the record, we conclude that the initial stop by Agent Clinton was not authorized under the regulatory scheme in Louisiana governing WMAs to make the stop, nor did the stop qualify as a road-block or an investigatory stop exception to the warrant requirement under the Fourth Amendment of the U.S. Constitution or the state constitutional right to privacy. Accordingly, the evidence obtained as a result of the illegal stop should have been suppressed.
The Constitution of the United States guarantees "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. Amend. IV. The Fourth Amendment is enforceable against the states through the Fourteenth Amendment. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).
The Louisiana Constitution echoes the Fourth Amendment, providing that "every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures or invasions of privacy." La. Const. art. 1, § 5. While, in some instances, Louisiana's constitution has been held to afford greater protection for individual rights than the Fourth Amendment, e.g., State v. Perry, 610 So.2d 746 (La.1992), the Louisiana *1267 Supreme Court stated in State v. Jackson, supra, that this greater protection did not extend to automobile checkpoints. 764 So.2d at 71. The drafters of the Louisiana Constitution, the court concluded, intended to parallel U.S. Supreme Court decisions regarding individual liberty; the additional phrase, "invasions of privacy," added "no additional barrier between the motorist and traditional law enforcement functions." Id.
Although a police officer must normally have probable cause to effectuate a reasonable seizure, exceptions to this requirement have evolved. The United States Supreme Court has approved an exception for search and seizure by a governmental authority where the officer has no articulable suspicion of wrongdoing in the context of border checkpoints to reduce the flow of illegal immigrants, United States v. Martinez-Fuerte, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); checkpoints to verify driver's licenses, Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); and checkpoints to determine sobriety, Michigan Dep't of State Police v. Sitz, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990). In Delaware v. Prouse, the reasonableness of the seizure was determined by "balancing [the] intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." 440 U.S. at 654, 99 S.Ct. 1391, 59 L.Ed.2d 660. Random automobile inspections conducted without articulable and reasonable suspicion that a motorist is in violation of a traffic regulation are prohibited unless there are previously specified "neutral criteria" which prevent the unfettered exercise of discretion by a police officer in the field. Id. at 662, 99 S.Ct. at 1396. Notably, however, the Supreme Court suggested the "[q]uestioning of all oncoming traffic at roadblock-type stops" as a presumably constitutional alternative. Id. at 663, 99 S.Ct. 1401.
In Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), the Court proposed a balancing test to evaluate the constitutionality of seizures made without articulable suspicion of wrongdoing that weighs "the gravity of public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." 443 U.S. at 50-51, 99 S.Ct. 2637, 61 L.Ed.2d 357. Above all, such a seizure must be conducted under a plan "embodying explicit, neutral limitations on the conduct of individual officers." Id.
On the other hand, the right of law enforcement officers to temporarily detain and interrogate persons reasonably suspected of criminal activity is well established. La. C. Cr. P. art. 215.1; Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); State v. Fauria, 393 So.2d 688 (La.1981); State v. Taylor, 363 So.2d 699 (La.1978). The right to make an investigatory stop must be based on reasonable cause to believe that the suspect has been, is, or is about to be engaged in criminal activity. State v. Washington, 621 So.2d 114 (La.App. 2 Cir.), writ denied 626 So.2d 1177 (1993); State v. Patterson, 588 So.2d 392 (La.App. 4 Cir.1991); State v. Thibodeaux, 531 So.2d 284 (La.App. 3 Cir.1987). Reasonable cause for an investigatory stop is something less than probable cause, but the officer must have "articulable knowledge" of particular facts which, in conjunction with reasonable inferences drawn therefrom, provide reasonable grounds to suspect the detainee of criminal activity. State v. Flowers, 441 So.2d 707 (La.1983), cert. denied, 466 U.S. 945, 104 S.Ct. 1931, 80 L.Ed.2d 476 (1984); State v. Washington, supra; State v. Thibodeaux, supra; *1268 State v. Rodriguez, 396 So.2d 1312 (La.1981).
Public safety requires some flexibility for police to investigate and prevent crime. State v. Wesley, 28,012 (La.App. 2 Cir. 4/3/96), 671 So.2d 1257, writ denied 96-1127 (La.10/4/96), 679 So.2d 1379. Police officers are justified in ordering passengers out of cars, for officer safety. It may be a slight inconvenience, but it is not a serious intrusion upon privacy interests. State v. Landry, 588 So.2d 345 (La.1991). To assess the validity of an investigatory stop, the critical inquiry focuses on the officer's knowledge at the time of the stop. State v. Williams, 421 So.2d 874 (La.1982); State v. Wesley, supra.
In this instance, the state did not argue at the motion to suppress or on appeal that there existed reasonable suspicion to make an investigative stop or Terry stop. Clinton testified, and the trial court found, that he had the regulatory authority to stop the Holt vehicle to learn if a self-clearing permit had been obtained by the driver under Section 111(G) of Title 76, Part XIX of the Louisiana Administrative Code. The regulation reads, in pertinent part:
G. Wildlife Management Area Regulations
1. General
a. The following rules and regulations concerning the management, protection and harvest of wildlife have been officially approved and adopted by the Wildlife and Fisheries Commission in accordance with the authority provided in Louisiana Revised Statutes of 1950, Section 109 of Title 56. Failure to comply with these regulations will subject individuals to citation and/or expulsion from the management area.
b. Citizens are cautioned that by entering a WMA managed by the LDWF they may be subjecting themselves and/or their vehicles to game and/or license checks, inspections and searches. (Emphasis added).
* * *
2. Permits
* * *
b. Self-Clearing Permits. A self-clearing permit is required for all activities (hunting, fishing, hiking, birdwatching, sightseeing, etc.) on WMAs unless otherwise specified. The self-clearing permit will consist of three portions  check in, check out and a vehicle tag. On WMAs where self-clearing permits are required, all persons must obtain a WMA self-clearing permit from an information station. The check in portion must be completed and put in a permit box before each day's activity on the day of the activity. Users may check-in one day in advance of use. The check out portion must be carried by each person while on the WMA and must be completed and put in a permit box immediately upon exiting the WMA or within 72 hours after checking in if hunting from a camp. Each person must leave the vehicle tag portion of his permit on the dashboard of the vehicle used to enter into the WMA in such a way that it can be easily read from outside of the vehicle. This must be done only when the vehicle is parked and left unattended on the WMA. . . . (Self-clearing permits are not required for persons only traveling through the WMA provided that the most direct route is taken and no activities or stops take place.) (Emphasis added).
Our reading of the regulation above discloses first that a self-clearing permit is required to be displayed on the dashboard of the vehicle "only when the vehicle is *1269 parked and left unattended on the WMA," and second, "self-clearing permits are not required for persons only traveling through the WMA provided that the most direct route is taken and no activities or stops take place." Hence, the regulatory authority to make the stop claimed by Agent Clinton is absent in the statute. Agent Clinton testified that the reason he stopped the vehicle was that he did not see a self-clearing permit on the dashboard; however, the statute does not require that such a permit be displayed unless the vehicle is stopped and unattended. Second, Agent Clinton stated that Tram Road where the stop occurred is a main road that connects to the community of Ivan. Self-clearing permits are not required for persons only traveling through the WMA provided that the most direct route is taken and no stops take place. Agent Clinton did not express any reason to suspect that the vehicle was not simply passing through the WMA. He admitted that he did not observe any grounds to believe that the people in the vehicle were engaged in any criminal activity.
The trial court stated that Agent Clinton had a good faith belief that he had the authority to make the stop. In Delaware v. Prouse, supra, the U.S. Supreme Court prohibited the practice of randomly stopping people to check for inspection stickers, holding that "persons in automobiles on public roadways may not for that reason alone have their travel and privacy interfered with at the unbridled discretion of police officers." 440 U.S. at 663, 99 S.Ct. 1391.
The state cites State v. McHugh, supra,[1] for support of its position that the suspicionless stop was authorized under state regulatory authority. In McHugh, the supreme court concluded that a balancing test, not a probable cause test, should be applied to determine whether stops for the purpose of checking hunting licenses and for game queries violate the Fourth Amendment. A special test created by the court would (1) weigh the state's interest in safeguarding wildlife and fisheries, (2) determine whether the state had a special governmental need outside the ordinary law enforcement context to have its wildlife officers stop hunters during open season; (3) require only slight intrusive impact consisting of interference sufficiently less intrusive than an arrest; and (4) ascertain whether the state's compelling and special objectives cannot be achieved through means significantly less restrictive of privacy freedoms.
The McHugh court recognized, among other things, that the state has a great interest in protecting wildlife and fisheries, and enforcement of hunting license requirements was not a part of ordinary law enforcement procedures. If hunting licenses could not be randomly checked, hunters would have no incentive to comply with the law. The court concluded that the interference with legitimate hunters is minimal and the impact on non-hunters is almost non-existent. Moreover, hunters expect that their licenses will be checked, and such stops have close geographical and temporal ties to hunting activities. Finally, the court noted that the only way for game agents to tell if a hunter is licensed is to stop him and check. Thus, because the defendants in McHugh were exiting a wildlife area during hunting season under circumstances clearly indicating they had been hunting and possibly had game in *1270 their possession, the court concluded that it was not an unreasonable search, seizure or invasion of privacy under the state and federal constitutions.
As noted above, the reasoning of McHugh was seriously questioned in State v. Jackson, supra, as discussed below. Assuming, for the sake of argument, that McHugh is good law, we nevertheless conclude that the stop by Agent Clinton for the purpose of determining whether the occupants of the vehicle had obtained an unrequired check-in permit does not meet the requirements of McHugh, and thereby violates the Fourth Amendment. The statutory requirement for self-clearing permits for users of the WMA is clearly directed to those individuals who enter the WMA for the purpose of hunting, fishing, boating and other recreational activities, and who intend to park and leave their vehicle unattended while engaged is such activities. The requirement for the self-clearing permit is not intended as a license to drive through the WMA. The cautionary statement to citizens in the regulation that by entering the LDWF they may be subjecting themselves and/or their vehicles to game and license checks, inspections and searches is clearly directed at the kind of recreational activities such as hunting, fishing, boating, birding and so on  activities in which wildlife agents are on the WMAs to monitor so that they may protect Louisiana's wildlife and fisheries. Indeed, the statute expressly excludes the need for a permit for those individuals merely driving through a WMA. The purpose of the permit is to inform wildlife agents of the nature of the recreational activity in which visitors are engaged, and for that reason is only required of those engaging in recreational activities on the WMA. This information filled in on the upper half of the permit form is left at the entrance box. The bottom portion of the permit must be placed on the dash of the vehicle if the vehicle is parked and left unattended. This allows agents to match the vehicle with the activities for which the permit was obtained. Thus the permit requirement is directly related to the activities visitors involve themselves in on the WMA outside their vehicles. So long as a person is simply driving through a main road on the WMA and not operating his or her vehicle illegally or dangerously, there is little impact on the WMA and no need for a permit. Accordingly, while it is indisputable that the state has an interest in protecting and conserving its wildlife management areas, this interest promoted by self-clearing permits is plainly directed by the statute toward those who are using the WMA for recreation. The stop in this instance did not serve the special governmental need of conserving the WMA, which conservation is outside the ordinary law enforcement context. Although we do not find this stop particularly inconvenient, it does appear to be arbitrary or discretionary on the part of the agent and constitutes an invasion of privacy. The state's compelling objectives of protecting its WMAs can and, in fact, are authorized by statute through means that are significantly less restrictive of privacy freedoms, namely, by requiring only WMA users to obtain the self-clearing permits and display evidence of their permit on the dash of their vehicle when engaged in the activities for which they have registered. Even the McHugh court expressly limited its ruling to game agent stops of hunters "in or departing from a wildlife habitat in open season." It required that circumstances indicate that the person stopped had been hunting.
State v. McHugh has arguably been overruled by the supreme court in State v. Jackson, supra, at least with regard to checkpoints. The Jackson case involved the use of checkpoints by police to verify *1271 that vehicles contained proof of insurance. The court held such checkpoints, employed under certain guidelines, did not violate the Fourth Amendment prohibition against unreasonable seizures, expressly overruling State v. Church, 538 So.2d 993 (La. 1989). The court also expressly stated that the distinctions created in McHugh for hunting license checkpoints "create[d] the anomaly that preservation of the state's wildlife is a more compelling governmental interest than the protection of human life from drunken drivers on our public roadways," and the court expressly "refused to further a fractured approach to constitutional analysis" of checkpoints "depending on the laws they are designed to enforce." Id. at 69. After careful consideration of McHugh and other cases, the court declined "to draw a distinction that makes the result in a given case depend on how police characterize the checkpoint."
Instead, the Jackson court adopted a new approach to checkpoints that withstands scrutiny under the Louisiana Constitution "regardless of which laws they are designed to enforce." Id. The court set forth the following guidelines for evaluating whether the checkpoint's intrusiveness will withstand constitutional muster under the Fourth Amendment and Louisiana Const. art. 1, § 5:
(1) the location, time and duration of a checkpoint, and other regulations for operation of the checkpoint, preferably in written form, established by supervisory or other administrative personnel rather than the field officers implementing the checkpoint;
(2) advance warning to the approaching motorist with signs, flares and other indications to warn of the impending stop in a safe manner and to provide notice of its official nature as a police checkpoint;
(3) detention of the motorist for a minimal length of time; and
(4) use of a systematic nonrandom criteria for stopping motorists. Importantly, the court added that "[i]n evaluating a checkpoint under this test, the guiding principle must be that the procedures utilized curtail the unbridled discretion of the officer in the field. Prouse, supra, 440 U.S. at 662, 99 S.Ct. 1391, 59 L.Ed.2d 660; Brown, supra, 443 U.S. at 51, 99 S.Ct. 2637, 61 L.Ed.2d 357." Id. at 71.
Agent Clinton indicated that he normally stops all vehicles passing through the Bodcau WMA to determine if they have obtained a self-clearing permit. The trial court noted this testimony, possibly to indicate that the stop constituted a type of checkpoint stop. As noted in State v. Jackson, supra, "a checkpoint constitutes a seizure under the Fourth Amendment," and sets forth guidelines above to evaluate checkpoints.
In this instance, the checkpoint set up by Agent Clinton does not meet these guidelines. Guided by the principle that the procedures utilized should curtail the unbridled discretion of the officer in the field, we note that the guidelines are clearly not met in this instance. First, there is no indication that the checkpoints set up by Agent Clinton are the result of an administrative decision; rather, the clear implication is that Agent Clinton made the decision to set up the checkpoint and when and where to do it. Next, there was no apparent notice of the checkpoint with signs or flares. While the detention of a motorist appears to be minimal, in this instance, the stop appears to be arbitrary, since, in fact, there is no regulatory requirement for all vehicles in the WMA to have a permit on display, which was the pretext given for the stop in this instance.
For these reasons, we conclude that the stop in this case violated the Fourth Amendment prohibition against warrantless *1272 searches and seizures, and violates the Louisiana Constitutional right against invasions of privacy. Although a stop to inquire whether the occupants of a vehicle are passing through a WMA is a minimal intrusion, we have previously observed: "It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviation from legal modes of procedure. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon." Garrett v. City of Bossier City, 34,784 (La.App. 2 Cir. 6/20/01), 792 So.2d 24. (Citations omitted).
For this reason, the trial court erred in denying the motion to suppress. We reverse that judgment, and vacate and set aside the conviction for possession of marijuana based upon evidence seized as a result of the unlawful stop.
By his second assignment of error, defendant contends that the court committed manifest error when it found him guilty of resisting an officer by fleeing when he was not told he was under arrest at the time he fled.
Agent Clinton testified that after he obtained consent to search the vehicle, he told the defendant to get out of the vehicle. He testified that the defendant got out of the vehicle and put his right hand in his pocket. Agent Clinton then told him to take his hand out of his pocket and put his hands on the vehicle. He testified that he intended to do a pat-down search of the defendant. Instead, the defendant pulled a small plastic bag from his pocket, placed it in his mouth, and fled. Agent Clinton chased the defendant, apprehended him, and placed him under arrest.
The crime of resisting an officer under La. R.S. 14:108 is defined as follows:
A. Resisting an officer is the intentional interference with, opposition or resistance to, or obstruction of an individual acting in his official capacity and authorized by law to make a lawful arrest or seizure of property or to serve any lawful process or court order when the offender knows or has reason to know that the person arresting, seizing property, or serving process is acting in his official capacity.
B. (1) The phrase "obstruction of" as used herein shall, in addition to its common meaning, signification, and connotation mean the following:
(a) Flight by one sought to be arrested before the arresting officer can restrain him and after notice is given that he is under arrest.
(b) Any violence toward or any resistance or opposition to the arresting officer after the arrested party is actually placed under arrest and before he is incarcerated in jail.
(c) Refusal by the arrested party to give his name and make his identity known to the arresting officer or providing false information regarding the identity of the arrested party to the arresting officer.
(d) Congregation with others on a public street and refusal to move on when ordered by the officer.
(2) The word "officer" as used herein means any peace officer, as defined in R.S. 40:2402, and includes deputy sheriffs, municipal police officers, probation and parole officers, city marshals and deputies, and wildlife enforcement agents.
C. Whoever commits the crime of resisting an officer shall be fined not more than five hundred dollars or be imprisoned for not more than six months, or both.
*1273 Essential to a conviction under R.S. 14:108 is the defendant's knowledge of his arrest or impending detention. State v. Nix, 406 So.2d 1355 (La.1981); State v. Hines, 465 So.2d 958 (La.App. 2 Cir.1985), writ denied, 467 So.2d 536 (La.1985).
Defendant argues that he was free to run away because he had not been placed under arrest. Agent Clinton testified that he had not arrested the defendant when he fled but that he told the defendant to place his hands on the vehicle and he intended to "pat down" the defendant.
In State v. Nix, supra, police investigating a report of a domestic disturbance involving the defendant and his former mother-in-law at the latter's residence, asked the defendant to drive to a sheriff's office for questioning. As the defendant, in his vehicle, neared the sheriff's office, he suddenly accelerated and fled into Texas. The defendant was eventually apprehended and arrested for resisting an officer. On appeal, the Louisiana Supreme Court found that because the officers were not engaged in attempting to seize property, serve process or make an arrest at the time the defendant fled, he could not be considered as having resisted an officer.
In this instance, the officer was attempting to search the vehicle when he told the defendant to get out of the vehicle. Because the defendant was not under arrest, he cannot be convicted of resisting an officer under La. R.S. 14:108 A.
Additionally, even if we were to conclude that defendant's conduct constituted resisting an officer, because we conclude that the stop and subsequent search was unlawful, defendant had every right to resist an illegal restraint of his liberty. An individual in Louisiana has a time-honored right to resist an illegal arrest. City of Monroe v. Goldston, 95-0315 (La.9/29/95), 661 So.2d 428; White v. Morris, 345 So.2d 461, 465 (La.1977); State v. Lopez, 256 La. 108, 235 So.2d 394 (1970).
Accordingly, defendant's conviction for resisting an officer is reversed and set aside.

Conclusion
For the foregoing reasons, we vacate and set aside defendant's convictions and sentences for possession of marijuana and resisting an officer. The trial court's judgment denying defendant's motion to suppress is reversed, and the case remanded to trial court for further proceedings.
CONVICTIONS AND SENTENCES VACATED AND SET ASIDE; JUDGMENT REVERSED; REMANDED.
NOTES
[1] The supreme court in State v. Jackson, supra, seriously questioned the reasoning in State v. McHugh, where the court adopted a special test for wildlife agents to conduct random and suspicionless stops of hunters departing a wildlife habitat for the purpose of checking hunting licenses and game information.